Filed 4/12/23 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| HECTOR CASTELLANOS et al.,<br><br>　　Plaintiffs and Respondents,<br><br>v.<br><br>STATE OF CALIFORNIA et al.,<br><br>　　Defendants and Appellants;<br><br>PROTECT APP-BASED DRIVERS AND SERVICES et al.,<br><br>　　Interveners and Appellants. | A163655<br><br>(Alameda County Super. Ct. No. RG21088725)<br><br>**ORDER MODIFYING OPINION; NO CHANGE IN JUDGMENT** |

THE COURT\*:

The concurrence and dissent to this opinion filed on March 13, 2023, is modified as follows:

1. On page 18 of the concurrence and dissent, in second full paragraph (which begins: "The deficiency I see here is structural."), in the last sentence of text, change the state constitutional

---

\* Brown, P. J., Streeter, J., Pollak, J. (Retired Presiding Justice of the Court of Appeal, First Appellate District, Division Four, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution).

1

reference at the end of that sentence from "article XIV, section 4" to "article XII, section 5" so the sentence reads:

> Because voter "electors" and the "Legislature" share the police power, they may each legislate on the subject of workers' compensation, which is why our Supreme Court has held that the article II, section 8(a) power to adopt initiative statutes is "encompass[ed]" within the Legislature's article XII, section 5 power.

2. On page 20 of the concurrence and dissent, in the partial paragraph at the top of the page, delete the phrase "workers' compensation matters" and insert in its place the phrase "matters falling within the scope of that provision" so that it reads:

> pointed out that the electors' ability to adopt statutes by initiative is a "similar power" to that of the Legislature under article XII, section 5 (*McPherson*, *supra*, 38 Cal.4th at p. 1033), not that the electors are "the Legislature" when they legislate on matters falling within the scope of that provision, having simply stepped into the shoes of the Legislature, clothed with article XII, section 5, authority.

3. On page 43 of the concurrence and dissent, in the first full paragraph (which begins: "Disagreeing with me on this point, . . ."), in the last sentence of text, change the word "appeared" to "appears" so that it reads:

> Nor do these cases give any reason for why the binding effect clause should be read as an implicit partial definition of "employer," a term that appears nowhere in the constitutional language and was already fully defined in the statutory scheme the voters ratified in 1918.

The modifications effect no change in the judgment.

Dated:  April 12, 2023

2

Trial Court:    Superior Court of California, County of Alameda

Trial Judge:    Hon. Frank Roesch

Counsel:        Rob Bonta, Attorney General, Thomas S. Patterson, Senior Assistant Attorney General, Mark Beckington, Supervising Deputy Attorney General and Jose A. Zelidon-Zepeda, Deputy Attorney General, for Defendants and Appellants.

O'Melveny & Myers, Jeffery L. Fisher; Nielsen Merksamer Parrinello Gross & Leoni, Arthur G. Scotland, Sean P. Welch, Kurt R. Oneto and David J. Lazarus, for Interveners and Appellants.

DLA Piper, Stanley J. Panikowski and Justin R. Sarno for Former Attorney General of California Daniel E. Lungren as Amicus Curiae on behalf of Defendants and Appellants.

Eimer Stahl, Robert E. Dunn and Collin J. Vierra for Citizens in Charge as Amicus Curiae on behalf of Defendants and Appellants.

David A. Carrillo, California Constitution Center, University of California, Berkeley; Benbrook Law Group, Stephen M. Duvernay for California Constitution Center as Amicus Curiae on behalf of Defendants and Appellants.

Davis Wright Tremaine, Rochelle L. Wilcox and Alexa A. Graumlich for California Chamber of Commerce as Amicus Curiae on behalf of Defendants and Appellants and Interveners and Appellants.

3

Holtzman Vogel Baran Torchinsky Josefiak, Alex
    Vogel, Edward M. Wenger and Andrew Pardue
    for California Policy Center as Amicus Curiae
    on behalf of the Defendants and Appellants and
    Interveners and Appellants.

Willenken, Kenneth M. Trujillo-Jamison for
    California Asian Pacific Chamber of Commerce,
    California Hispanic Chambers of Commerce,
    Los Angeles Metropolitan Churches, National
    Action Network Los Angeles, National Action
    Network Sacramento Chapter Inc., National
    Asian American Coalition, and National
    Diversity Coalition ("Communities-of-Color
    Organizations") as Amici Curiae on behalf of
    Defendants and Appellants and Interveners
    and Appellants.

Baker Botts, Michael W. Ward for Arnold
    Schwarzenegger as Amicus Curiae on behalf of
    Defendants and Appellants and Interveners
    and Appellants.

Howard Jarvis Taxpayers Foundation, Jonathan M.
    Coupal, Timothy A. Bittle and Laura E.
    Dougherty for Howard Jarvis Taxpayers
    Association as Amicus Curiae on behalf of
    Defendants and Appellants and Interveners
    and Appellants.

Jenner & Block, Laurie J. Edelstein and Adam G.
    Unikowsky for Chamber of Commerce of the
    United States of America as Amicus Curiae on
    behalf of Defendants and Appellants and
    Interveners and Appellants.

King & Spalding, Albert Giang, Jeffery Hammer and Ramon A. Miyar for Marketplace Industry Association, Inc. as Amicus Curiae on behalf of Defendants and Appellants and Interveners and Appellants.

Buchalter, Steven G. Churchwell and Berit Elam for Daniel Schnur, T. Anthony Quinn and Robert M. Stern as Amici Curiae on behalf of Defendants and Appellants and Interveners and Appellants.

weintraub tobin chediak coleman grodin, Brendan J. Begley for Independent Drivers Alliance of California, Kelly Rickert, Ali Mazhin and Stephanie Whitfield as Amici Curiae on behalf of Defendants and Appellants and Interveners and Appellants.

Olson Remcho, Robin B. Johansen, Richard R. Rios, Deborah B. Caplan, Benjamin N. Gevercer; Altshuler Berzon, Stephen P Berzon, Scott A. Kronland, Stacey M. Leyton, Juhyung Harold Lee for Plaintiffs and Respondents Hector Castellanos, Joseph Delgado, Saori Okawa and Michael Robinson.

Service Employees International Union, Nicole G. Berner and Steven K. Ury for Plaintiff and Respondent Service Employees International Union.

Richard L. Hasen; Public Counsel, Mark D. Rosenbaum and Kathryn Eidmann for California Election Law Professors as Amicus Curiae on behalf of Plaintiffs and Respondents.

Hina B. Shah, Women's Employment Rights Clinic, Golden Gate University School of Law Benjamin Beach, PowerSwitch Action; Nayantara Mehta and Brian Chen, National Employment Law Project, for Gig Workers Rising, Mobile Workers Alliance, Rideshare Drivers United-California, We Drive Progress, A Better Balance, ACCE Institute, Action Center on Race & the Economy, Asian Americans Advancing Justice – Los Angeles, Bet Tzedek, California Employment Lawyers Association, California Immigrant Policy Center, Centro Legal de la Raza, Chinese Progressive Association, Economic Policy Institute, Jobs With Justice Education Fund and Jobs With Justice San Francisco, Lawyers Committee for Civil Rights of the San Francisco Bay Area, Legal Aid at Work, Los Angeles Black Worker Center, Maintenance Cooperation Trust Fund, National Black Worker Center, National Council for Occupational Safety and Health, National Domestic Workers Alliance, National Employment Law Project, Pilipino Workers Center, PowerSwitch Action, Public Rights Project, Santa Clara County Wage Theft Coalition, Women's Employment Rights Clinic of Golden Gate University School of Law and Worksafe, as Amici Curiae on behalf of Plaintiffs and Respondents.

Bush Gottlieb, Julie Gutman Dickinson, Hector De Haro, and Luke Taylor for International Brotherhood of Teamsters Local 848 and The Los Angeles County Federation of Labor, AFL-CIO, as Amici Curiae on behalf of Plaintiffs and Respondents.

6

City of San Francisco, David Chiu, City Attorney, Sara J. Eisenberg, Chief of Complex and Affirmative Litigation, and Molly J. Alarcon Deputy City Attorney; City of Oakland, Barbara J. Parker, City Attorney, Maria Bee, Chief Assistant City Attorney, Zoe Savitsky, Supervising Deputy City Attorney and Katherine Read, Fellowship Attorney; City of Los Angeles, Michael N. Feuer, City Attorney, Kathleen Kenealy, Chief Assistant City Attorney, and Michael J. Bostrom, Senior Assistant City Attorney for the Cities of San Francisco, Oakland and Los Angeles as Amici Curiae on behalf of Plaintiffs and Respondents.

Eric M. Overholt and Andrew W. Lockard for California Applicants' Attorneys Association as Amicus Curiae on behalf of Plaintiffs and Respondents.

Catherine L. Fisk, University of California, Berkeley; Veena Dubal and Joseph Grodin, Emeritus Professor of Law, University of California, Hastings College of Law, for Labor Law Professors Sameer Ashar, Veena Dubal, Catherine Fisk, Charlotte Garden, Joseph Grodin, William B. Gould IV, Stephen Lee, Sanjukta Paul, Leticia Saucedo, Reuel Schiller, Katherine Stone and Noah D. Zatz as Amici Curiae on behalf of Plaintiffs and Respondents.

Filed 3/13/23 (unmodified opinion)
**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| HECTOR CASTELLANOS et al.,<br><br>    Plaintiffs and Respondents,<br><br>v.<br><br>STATE OF CALIFORNIA et al.,<br><br>    Defendants and Appellants,<br><br>PROTECT APP-BASED DRIVERS AND SERVICES et al.,<br><br>    Interveners and Appellants. | A163655<br><br>(Alameda County Super. Ct. No. RG21088725) |

In November 2020, the voters approved Proposition 22, the Protect App-Based Drivers and Services Act (Proposition 22). (Bus. & Prof. Code, [1] §§ 7448–7467, as added by Prop. 22, approved by the voters at Gen. Elec. (Nov. 3, 2020).)  Shortly afterwards, Hector Castellanos, Joseph Delgado, Saori Okawa, Michael Robinson, Service Employees International Union

---

[1] Undesignated statutory citations are to the Business and Professions Code.

1

California State Council, and Service Employees International Union (SEIU; collectively, plaintiffs) filed a petition for writ of mandate seeking a declaration that Proposition 22 is invalid because it violates the California Constitution.[2] The trial court granted the petition, ruling that the proposition (1) is invalid in its entirety because it intrudes on the Legislature's exclusive authority to create workers' compensation laws; (2) is invalid to the extent that it limits the Legislature's authority to enact legislation that would not constitute an amendment to Proposition 22, and (3) is invalid in its entirety because it violates the single-subject rule for initiative statutes.

Proposition 22's proponents and the state appeal, arguing the trial court was mistaken on all three points. We agree that Proposition 22 does not intrude on the Legislature's workers' compensation authority or violate the single-subject rule, but we conclude that the initiative's definition of what constitutes an amendment violates separation of powers principles. Because the unconstitutional provisions can be severed from the rest of the initiative, we affirm the judgment insofar as it declares those provisions invalid and to the extent the trial court retained jurisdiction to consider an award of attorney's fees, and otherwise reverse.

## BACKGROUND

In 2019, the Legislature enacted Assembly Bill No. 5 (2019–2020 Reg. Sess.), which established a new test for

---

[2] Undesignated citations to constitutional articles and sections are to the California Constitution.

2

distinguishing between employees and independent contractors for the purposes of the Labor Code and Unemployment Insurance Code. (Stats. 2019, ch. 296; Lab. Code, § 2775, subd. (b)(1); *People v. Uber Technologies, Inc.* (2020) 56 Cal.App.5th 266, 274–277 [describing background of statute].)

In response, Davis White and Keith Yandell, supported by a group called Protect App-Based Drivers and Services (Protect Drivers; collectively, interveners), proposed Proposition 22. (§ 7449, subd. (d).) An "[a]pp-based driver" is a person who works as a driver or courier for transportation or delivery network companies, which are businesses that operate transportation or delivery services using an electronic application or platform to connect passengers seeking transportation or customers seeking delivery of goods to drivers or couriers willing to provide those services with their personal vehicles. (§ 7463, subds. (a), (f), (i), (q).) Among the supporters of Protect Drivers and Proposition 22 were rideshare and delivery network companies such as Uber Technologies, Inc., Lyft, Inc., and DoorDash, Inc.

When interveners requested a title and summary of the measure so they could gather the necessary signatures to qualify it for the ballot, the Attorney General gave it the title "Changes Employment Classification Rules for App-Based Transportation and Delivery Drivers." The Attorney General later modified the title for the purposes of the voter information guide, titling it "Exempts App-Based Transportation and Delivery Companies from Providing Employee Benefits to Certain Drivers." (Voter Information Guide, Gen. Elec. (Nov. 3, 2020) title and summary

3

of Prop. 22, p. 56 (Voter Guide).) White and Protect Drivers filed a petition for writ of mandate in Sacramento County Superior Court to compel the Attorney General to revise the title and summary, but that court denied the petition.

Proposition 22 added sections 7448 to 7467 to the Business and Professions Code. (Proposition 22, § 1, available at <https://repository.uchastings.edu/ca_ballot_inits/2165/> [as of Mar. 13, 2023].) Section 7450 states the initiative's purposes are to (1) "protect the basic legal right of Californians to choose to work as independent contractors with rideshare and delivery network companies"; (2) "protect the individual right of every app-based rideshare and delivery driver to have the flexibility to set their own hours for when, where, and how they work"; (3) "require rideshare and delivery network companies to offer new protections and benefits for app-based rideshare and delivery drivers"; and (4) "improve public safety by requiring criminal background checks, driver safety training, and other safety provisions to help ensure app-based rideshare and delivery drivers do not pose a threat to customers or the public." (§ 7450.)

To achieve these purposes, section 7451, titled "Protecting Independence," provides, "Notwithstanding any other provision of law, including, but not limited to, the Labor Code, the Unemployment Insurance Code, and any orders, regulations, or opinions of the Department of Industrial Relations or any board, division, or commission within the Department of Industrial Relations, an app-based driver is an independent contractor and not an employee or agent with respect to the app-based driver's

4

relationship with a network company" if the company does not control the drivers in certain specified ways. (§ 7451.)[3] Proposition 22 then details certain benefits to which drivers are entitled, including a health care subsidy for drivers meeting certain minimum requirements for hours spent providing services (as opposed to waiting to provide services); a minimum earnings guarantee based on time spent providing services; occupational accident insurance; and contract, anti-discrimination, and termination rights. (§§ 7452–7456, 7463, subd. (j).) The initiative also includes various obligations for drivers relating to safety, such as background check and rest requirements. (§§ 7458, 7461.)

Section 7465 is the only section contained in article 9, which is titled "Amendment"; it describes the circumstances in which the Legislature can amend Proposition 22 without voter approval. (§ 7465.) As relevant here, section 7465 states that the

---

[3] The specific conditions section 7451 imposes for an app-based driver to qualify as an independent contractor are: "(a) The network company does not unilaterally prescribe specific dates, times of day, or a minimum number of hours during which the app-based driver must be logged into the network company's online-enabled application or platform. [¶] (b) The network company does not require the app-based driver to accept any specific rideshare service or delivery service request as a condition of maintaining access to the network company's online-enabled application or platform. [¶] (c) The network company does not restrict the app-based driver from performing rideshare services or delivery services through other network companies except during engaged time. [¶] (d) The network company does not restrict the app-based driver from working in any other lawful occupation or business."

5

Legislature can amend Proposition 22's provisions with a statute passed by a seven-eighths majority in both houses, so long as the statute is "consistent with, and furthers the purpose of," the initiative and the Legislature complies with certain procedural requirements. (§ 7465, subd. (a).) Section 7465, subdivision (c) (section 7465(c)) then addresses the application of these requirements. Section 7465(c)(1) states that the initiative's purposes are described in sections 7448 to 7450. Section 7465(c)(2) states that any statute that amends the definition of app-based drivers as independent contractors in section 7451 does not further those purposes, effectively preventing the Legislature from amending that section without voter approval. Section 7465(c)(3) declares that any statute that places unequal regulatory burdens on app-based drivers, such as a rule that prohibits only app-based drivers from performing particular services, constitutes an amendment of the initiative. And section 7465(c)(4) declares that a statute constitutes an amendment if it "authorizes any entity or organization to represent the interests of app-based drivers in connection with drivers' contractual relationships with network companies, or drivers' compensation, benefits, or working conditions."

Proposition 22 contains a severability clause declaring that if any provision is held to be invalid, the remainder of the initiative shall remain valid, except that the invalidity of anything in section 7451—which declares drivers to be independent contractors and not employees under certain conditions—would invalidate the entire initiative. (§ 7467.)

6

The voters approved Proposition 22 in November 2020, with 58.6 percent of voters in favor and 41.4 percent opposed.

In January 2021, plaintiffs filed a petition for writ of mandate in the California Supreme Court seeking a declaration that Proposition 22 is invalid. The Supreme Court denied the petition in February 2021 "without prejudice to refiling in an appropriate court," though two justices were of the opinion that the court should have issued an order to show cause. (*Castellanos v. State of California*, S266551, Supreme Ct. Mins., Feb. 3, 2021.)

A week later, plaintiffs filed a petition for writ of mandate in Alameda County Superior Court. Plaintiffs named as defendants the State of California and Katie Hagen as the director of the Department of Industrial Relations (defendants). By stipulation, the trial court granted interveners leave to intervene to oppose the petition as real parties in interest.

Plaintiffs alleged that Proposition 22 is invalid for four reasons. First, they argued it improperly limits the Legislature's authority in article XIV, section 4 of the California Constitution to create a workers' compensation system.[4] Second, plaintiffs alleged that Proposition 22's provision defining what types of

_____

[4] The provision was originally found in article XX, section 21. (See *Mathews v. Workmen's Comp. Appeals Bd.* (1972) 6 Cal.3d 719, 724, fn. 2, 734 (*Mathews*).) It was renumbered in a constitutional reorganization in 1976, without substantive change. (See *Pacific Legal Foundation v. Brown* (1981) 29 Cal.3d 168, 184, fn. 8; Ballot Pamp., Prim. Elec. (June 8, 1976) pp. 58–59.) For simplicity, we refer to this provision using its current numbering, regardless of the time period at issue.

7

statutes would constitute amendments to the initiative violates the separation of powers doctrine because it restricts the courts' authority to interpret the Constitution. Third, they alleged that the amendment provision violates the separation of powers because it attempts to prevent the Legislature from enacting laws on matters not substantively addressed within the measure. Fourth, plaintiffs alleged that one aspect of the amendment provision violates the rule in article II, section 8 of the Constitution limiting initiatives to a single subject because it imposes restrictions on subjects not substantively addressed in the initiative and it deceived voters into adopting restrictions that they did not understand.

In August 2021, the trial court agreed with plaintiffs' first, third, and fourth arguments. It issued a judgment in September 2021 declaring Proposition 22 invalid in its entirety and ordering Hagen, as director of the Department of Industrial Relations, not to enforce any of Proposition 22's provisions.

## DISCUSSION

### I. General Legal Principles and Standard of Review

The trial court's ruling that Proposition 22 is unconstitutional turns on the interplay between the language of Proposition 22 and constitutional provisions governing workers' compensation law, the initiative power, and the separation of powers. "We apply similar principles when construing constitutional provisions and statutes, including those enacted through voter initiative. [Citation.] Our primary concern is giving effect to the intended purpose of the provisions at issue.

8

[Citation.] In doing so, we first analyze provisions' text in their relevant context, which is typically the best and most reliable indicator of purpose. [Citations.] We start by ascribing to words their ordinary meaning, while taking account of related provisions and the structure of the relevant statutory and constitutional scheme. [Citations.] If the provisions' intended purpose nonetheless remains opaque, we may consider extrinsic sources, such as an initiative's ballot materials. [Citation.] Moreover, when construing initiatives, we generally presume electors are aware of existing law. [Citation.] Finally, we apply independent judgment when construing constitutional and statutory provisions." (*California Cannabis Coalition v. City of Upland* (2017) 3 Cal.5th 924, 933–934.)

" '[T]he Constitution's initiative and referendum provisions should be liberally construed to maintain maximum power in the people.' " (*Independent Energy Producers Assn. v. McPherson* (2006) 38 Cal.4th 1020, 1032 (*McPherson*).) The Supreme Court has declared it the courts' " 'solemn duty to jealously guard the precious initiative power, and to resolve any reasonable doubts in favor of its exercise.' " (*Briggs v. Brown* (2017) 3 Cal.5th 808, 827 (*Briggs*).) " ' "We do not consider or weigh the economic or social wisdom or general propriety of the initiative. Rather, our sole function is to evaluate [it] legally in the light of established constitutional standards." ' [Citations.] ' "[A]ll presumptions and intendments favor the validity of a statute and mere doubt does not afford sufficient reason for a judicial declaration of invalidity. Statutes must be upheld unless their unconstitutionality clearly,

9

positively, and unmistakably appears." [Citations.] If the validity of the measure is "fairly debatable," it must be sustained.' " (*Id.* at p. 828.)

"We consider only the objections raised by the [case] before us. 'We have no occasion at this time to consider other possible attacks,' and 'except as necessary to resolve the basic questions before us, we do not consider in this case possible interpretive or analytical problems' that might arise from the measure in the future." (*Briggs, supra,* 3 Cal.5th at p. 827.) We review here a facial challenge to the constitutionality of Proposition 22, and we express no view on claims that might be asserted in specific applications of the initiative.

## II. Article XIV, Section 4 of the California Constitution

Article XIV, section 4 of the California Constitution begins, "The Legislature is hereby expressly vested with plenary power, unlimited by any provision of this Constitution, to create, and enforce a complete system of workers' compensation, by appropriate legislation, and in that behalf to create and enforce a liability on the part of any or all persons to compensate any or all of their workers for injury or disability, and their dependents for death incurred or sustained by the said workers in the course of their employment, irrespective of the fault of any party." (Cal. Const., art. XIV, § 4.)[5]

The trial court's ruling based on this provision is straightforward. Article II, section 10, subdivision (c) (Cal.

---

[5] Additional portions of article XIV, section 4 are quoted in other parts of this opinion. (See, e.g., fn. 11 and pp. 26–28, *post.*)

Const., art. II, § 10(c)) allows the Legislature to amend an initiative statute only if the voters approve the amendment, unless the initiative permits amendment without voters' approval, in which case the Legislature must comply with any conditions the voters impose.[6]  Because of this authority, the Legislature cannot amend or repeal section 7451 at all to classify app-based drivers as employees for the purposes of workers' compensation or amend the initiative in any other respect without a seven-eighths majority or the approval of the voters. The trial court concluded these restrictions on the Legislature are contrary to article XIV, section 4's statement that the Legislature's power to create a workers' compensation system is "plenary" and "unlimited by any provision of this Constitution." The trial court pointed out that the voters added the phrase "unlimited by any provision of this Constitution" to article XIV, section 4, in a constitutional amendment in 1918, seven years after they amended the Constitution to allow for voter initiatives. It concluded the plain meaning of article XIV, section 4 prevailed over the more general provision in article II, section 10(c). Finally, because Proposition 22 states that any invalidation of section 7451 invalidates the entire initiative, the trial court found the constitutional conflict renders Proposition 22 invalid in its entirety.

---

[6] Article II, section 10(c) states in pertinent part, "The Legislature may amend or repeal an initiative statute by another statute that becomes effective only when approved by the electors unless the initiative statute permits amendment or repeal without the electors' approval."

11

The Supreme Court's decision in *McPherson*, *supra*, 38 Cal.4th 1020, which involved a provision worded similarly to article XIV, section 4, is contrary to the trial court's ruling, so we discuss it in some detail. At issue there was article XII, section 5, which states, "The Legislature has plenary power, unlimited by the other provisions of this constitution but consistent with this article, to confer additional authority and jurisdiction upon the [Public Utilities Commission (PUC)], to establish the manner and scope of review of commission action in a court of record, and to enable it to fix just compensation for utility property taken by eminent domain." (*McPherson*, at p. 1032.) An initiative statute would have expanded the PUC's authority over electric service providers. (*Id.* at p. 1026.) Opponents of the initiative argued that the initiative statute violated the Legislature's exclusive authority to expand the PUC's authority. (*Id.* at p. 1027.)

The Court of Appeal held that this constitutional provision was clear and unambiguous and dictated that only the Legislature could confer additional authority on the PUC, not the voters. (*McPherson*, *supra*, 38 Cal.4th at p. 1032.) The Court of Appeal recognized that courts had previously held that references in the Constitution to the Legislature having a power did not deprive the voters of their initiative power. (*McPherson*, at pp. 1033–1035.) But the Court of Appeal found those cases distinguishable because article XII, section 5 gave the Legislature "plenary" power that was " 'unlimited by the other provisions of this constitution.' " (*McPherson*, at p. 1035.)

12

Before the Supreme Court, the proponents of the initiative challenged the Court of Appeal's reasoning by pointing out that a "plenary power" is complete but is not necessarily exclusive. (*McPherson, supra,* 38 Cal.4th at p. 1035.)  They also noted that the Court of Appeal's broad interpretation of the "unlimited" clause logically would have meant "that a statute passed by the Legislature pursuant to article XII, section 5 would not be subject to *any* provision of the California Constitution, including, for example, the provision authorizing the Governor to veto a bill approved by the Legislature." (*Id.* at p. 1036.)  The Supreme Court agreed that these arguments showed that article XII, section 5 was not unambiguous, "[p]articularly in light of the numerous past California authorities holding that constitutional references to the Legislature's authority to take specified action generally are not interpreted to limit the initiative power." (*McPherson,* at p. 1036.)  The court therefore considered the origin and background of the constitutional language. (*Id.* at pp. 1036–1037.)  The voters had added the language to the Constitution in 1911, the same year as the initiative power. (*McPherson,* at pp. 1037–1041.)  Because both the initiative power and the language allowing the Legislature to expand the authority of the PUC were part of the reform program of the progressive movement, the court found it "most improbable" that the voters intended the amendment to article XII, section 5 to limit the scope of the initiative power they approved simultaneously, "without any direct or explicit statement to this effect." (*McPherson,* at p. 1042.)

*McPherson* reveals two flaws in the trial court's ruling. First, *McPherson* expressly approved "long-standing California decisions establishing that references in the California Constitution to the authority of the Legislature to enact specified legislation generally are interpreted to include the people's reserved right to legislate through the initiative power." (*McPherson, supra,* 38 Cal.4th at p. 1043.)  This principle—which plaintiffs do not dispute—deprives the trial court's textual argument of much of its force.  Rather than read article XIV, section 4 as conferring plenary, unlimited power on the Legislature and only the Legislature, *McPherson* requires that we read article XIV, section 4 as though it said, "The Legislature *or the electorate acting through the initiative power are* hereby expressly vested with plenary power, unlimited by any provision of this constitution, to create, and enforce a complete system of workers' compensation . . . ."  (See *McPherson*, *supra*, 38 Cal.4th at pp. 1032 [" 'the power of the people [to enact statutes] through the statutory initiative *is coextensive* with the power of the Legislature' "], 1033, 1042–1043 [reading article XII, section 5 as though it referred to the electorate's initiative power].)[7]

---

[7] This aspect of *McPherson* answers the contention underlying much of the dissenting opinion that article XIV, section 4 delegates power specifically to the Legislature and not the voters.  (Conc. & dis. opn., *post*, at p. 30.)  The dissenting opinion's view rests primarily on the fact that article XIV, section 4 is not self-executing.  (Conc. & dis. opn., *post*, at pp. 30–31.)  There is no logical conflict between article XIV, section 4 needing implementing legislation and the voters retaining their initiative power in the same field; both can coexist.

14

Given that article XIV, section 4 must be construed to grant lawmaking authority to both the Legislature and the electorate, it is not significant that article XIV, section 4 confers plenary power, nor that the people may exercise their initiative power in a way that limits the Legislature's authority under article XIV, section 4. Article XIV, section 4 is not concerned with the allocation of power between the Legislature and the electorate, but rather with ensuring that the lawmaking bodies jointly and severally have authority to create a workers' compensation system. If the people enact an initiative statute to create or modify the workers' compensation system, they have exercised the plenary, unlimited authority that article XIV, section 4 confers and satisfied that aspect of the Constitution. As courts must liberally construe the initiative power and resolve doubts in favor of the use of the initiative wherever reasonable, this is the interpretation of article XIV, section 4 that we must adopt. (*Briggs, supra*, 3 Cal.5th at pp. 827–828.)

Second, *McPherson* shows that the trial court erred when it read article XIV, section 4 as a plain statement prevailing over the initiative power and that plaintiffs likewise err when reading it as an express repeal of the initiative power. *McPherson* held that nearly identical language regarding the Legislature's power vis à vis the PUC was "at most ambiguous." (*McPherson, supra*, 38 Cal.4th at p. 1025.) It reached that conclusion in part based on its reasoning that applying the "unlimited" language literally would mean that the Legislature could enact a law without having to comply with provisions of the Constitution like the one

15

that gives the Governor the right to veto legislation.  (*McPherson*, at p. 1036.)

The same rationale applies here.  Since article XIV, section 4's "unlimited" clause cannot mean that workers' compensation laws are exempt from every other aspect of the Constitution, it is ambiguous as to which aspects of the Constitution continue to apply and which do not.  As in *McPherson*, this finding of ambiguity would require us to consult the ballot materials from the election in 1918 at which the voters added the "unlimited" language to article XIV, section 4, in order to discern the intent behind it.  The initiative power was already part of the Constitution at that time, as the trial court noted.  But the Supreme Court has already concluded that the history of article XIV, section 4 shows the provision "was added to the Constitution and then amended for the *sole purpose* of removing all doubts as to the constitutionality of the then existing workmen's compensation statutes." (*Mathews*, *supra*, 6 Cal.3d at pp. 734–735, italics added.)[8]  Plaintiffs cite no authority or

---

[8] The dissenting opinion cites *Mathews, supra*, 6 Cal.3d at page 735, as supporting its theory that neither the Legislature nor the electorate can change any of the basic features of the pre-1918 workers' compensation system.  (Conc. & dis. opn., *post*, at p. 6.)  The point of *Mathews* was only that article XIV, section 4 was intended to authorize the workers' compensation system that already existed—not that those features became sacrosanct and untouchable by either the Legislature or the electorate.  (*City and County of San Francisco v. Workers' Comp. Appeals Bd.* (1978) 22 Cal.3d 103, 114 [article XIV, § 4's purpose "was simply to remove any doubt as to the constitutionality of the existing workers' compensation legislation, and *not to erect any new*

evidence indicating to the contrary that article II, sections 8 and 10 and article IV, section 1—relating to the initiative power— were provisions from which the voters intended to free the Legislature when enacting workers' compensation laws.  Absent such evidence, the notion that article XIV, section 4 should be read as limiting the voters' initiative power falls apart.[9]  To

_restrictions on the exercise of legislative power_," (citing _Mathews_, at pp. 733–734, fn. 11, italics added)].)  Because article XIV, section 4's purpose was to ensure that the workers' compensation system was " 'beyond the possibility of being attacked on technical grounds or by reason of any questioned want of constitutional authority,' " _Mathews_ rejected a constitutional challenge to the Legislature's enactment of an amendment to the workers' compensation scheme that expanded on a pre-1918 type of exclusion from coverage.  (_Mathews, supra,_ 6 Cal.3d at p. 735 & fn. 11, italics omitted.)  Nothing in _Mathews_ suggests that article XIV, section 4 prevents the Legislature from changing workers' compensation in any ways it sees fit, which is unsurprising given its grant of plenary authority to create a system requiring "_any or_ all persons to compensate _any or_ all of their workers."  (Cal. Const., art. XIV, § 4, italics added.)  The dissenting opinion disregards this language as merely confirming that the Legislature had not yet covered all potentially eligible workers, but that is precisely the point: it gives the Legislature the authority to change coverage if it chooses.  (Conc. & dis. opn., _post_, at p. 56.)  Notably, even plaintiffs agree that it has this authority, since they admit the Legislature could have excluded app-based drivers from workers' compensation coverage.

[9] Interveners ask us to judicially notice two sections from a treatise describing the history and purpose of article XIV, section 4 of the Constitution, as well as a 1918 newspaper editorial discussing the initiative that amended this provision. Relatedly, amicus curiae California Constitution Center seeks judicial notice of a host of news articles concerning the 1911 and 1918 propositions that created and amended article XIV, section 4.  We deny these requests as unnecessary.  (_County of San Diego_

paraphrase *McPherson*, it is "most improbable" that the voters in 1918—seven years after they "approved a far-reaching measure incorporating a broad initiative power as part of the California Constitution"—would have intended, "without any direct or explicit statement to this effect, to *limit* the use of the initiative power by virtue of the language" in article XIV, section 4. (*McPherson, supra*, 38 Cal.4th at p. 1042.)

Plaintiffs do not agree that *McPherson* controls here. Like the trial court, they rely on footnote 9 of that decision, where the Supreme Court "emphasize[d]" that its holding was "limited to a determination that the provisions of article XII, section 5 do not preclude the use of the initiative process to enact statutes conferring additional authority upon the PUC." (*McPherson, supra*, 38 Cal.4th at p. 1044, fn. 9.) The court continued, "We have no occasion in this case to consider whether an initiative measure relating to the PUC may be challenged on the ground that it improperly *limits* the PUC's authority *or improperly conflicts with the Legislature's exercise of its authority to expand the PUC's jurisdiction or authority*. Should these or other issues arise in the future, they may be resolved through application of the relevant constitutional provision or provisions to the terms of the specific legislation at issue." (*Ibid.*, second italics added.)

Plaintiffs assert that their challenge to Proposition 22 raises the type of conflict that *McPherson* foresaw and about which it reserved judgment, since they contend Proposition 22

---

*v. State of California* (2008) 164 Cal.App.4th 580, 613, fn. 29 [denying request for judicial notice as unnecessary].)

18

improperly conflicts with the Legislature's exercise of its authority to enact workers' compensation laws. Moreover, according to plaintiffs, applying *McPherson*'s logic to decide that a voter initiative relating to workers' compensation can conflict with the Legislature's authority under article XIV, section 4 would be contrary to *McPherson*'s instruction that a challenge to the Legislature's plenary, unlimited power under article XII, section 5 should be resolved "through application of the relevant constitutional provision or provisions to the terms of the specific legislation at issue." (*McPherson*, *supra*, 38 Cal.4th at p. 1044, fn. 9.) According to plaintiffs, there would have been no reason for our Supreme Court to include this footnote if a voter initiative can always undo what the Legislature does with plenary, unlimited power, like that which article XIV, section 4 provides.

We do not read *McPherson*'s footnote 9 as broadly as plaintiffs or the trial court. That footnote states only that the court had "no occasion" to address a challenge like the one in this case, meaning the court was not resolving such challenges either way. (*McPherson*, *supra*, 38 Cal.4th at p. 1044, fn. 9.) The court's generalized instruction to resolve such challenges "through application of the relevant constitutional provision or provisions to the terms of the specific legislation at issue" did not imply that the principles it had enunciated and applied in *McPherson* would have no bearing on such challenges. (*Ibid.*) The *McPherson* court may have wanted to leave open, as a precedential matter, the possibility that an argument could be made that an initiative statute improperly limited the

19

Legislature's authority in some fashion. But plaintiffs have failed to offer any argument to overcome the implications of *McPherson*'s reasoning on this question, which we do not lightly cast aside. (Cf. *City and County of San Francisco v. All Persons Interested in Matter of Proposition C* (2020) 51 Cal.App.5th 703, 715–717 [interpreting constitutional provision by applying reasoning and principles from Supreme Court decision interpreting separate but similar constitutional provision].) We see no justification for reaching a different interpretation than *McPherson* reached with respect to virtually identical language.

Seeking to distinguish *McPherson* and its point that a literal reading of "unlimited" would exclude the veto power, plaintiffs argue that article XIV, section 4, unlike the PUC-related provision at issue in *McPherson*, states that the Legislature's power to enact workers' compensation laws must be exercised "by appropriate legislation." They argue that appropriate legislation must be enacted bicamerally and presented to the Governor for veto.

Framing the inquiry in terms of "appropriate legislation" does not change the analysis. If we followed plaintiffs' argument, we would still have to determine what makes legislation appropriate or inappropriate, which would entail choosing which constitutional provisions would apply and which would not. It is not clear why the veto power and the initiative power would fall on different sides of that line. Plaintiffs characterize the veto as part of the "normal legislative process" and article II, section 10(c)'s voter-approval requirement for amendments to initiative

20

statutes as a "special limitation" on the Legislature's power. But plaintiffs cite nothing to support this distinction; both such limitations derive from the Constitution and have equal force. Plaintiffs' distinction is also inconsistent with the principle that " 'the Constitution's initiative and referendum provisions should be liberally construed to maintain maximum power in the people.' " (*McPherson*, *supra*, 38 Cal.4th at p. 1032.)

Rather than take up such free-floating standards, we adhere instead to *Hustedt v. Workers' Comp. Appeals Bd.* (1981) 30 Cal.3d 329. The Supreme Court there affirmed that "the adoption of article XIV, section 4 'effected a repeal *pro tanto*' of any state constitutional provisions which conflicted with that amendment. [Citations.] A *pro tanto* repeal of conflicting state constitutional provisions removes 'insofar as necessary' any restrictions which would prohibit the realization of the objectives of the new article." (*Id.* at p. 343; see *id.* at pp. 343–344 [article XIV, section 4 did not effect a *pro tanto* repeal of the judiciary's constitutional authority to discipline attorneys because permitting the Workers' Compensation Appeal Board (WCAB) to discipline attorneys was not necessary to effectuate the objectives of article XIV, section 4].) Because *McPherson* teaches that article XIV, section 4's objective was not to give the Legislature exclusive authority over workers' compensation laws, but rather to give such authority to the Legislature or the voters, *Hustedt* dictates that article XIV, section 4 did not repeal the voters'

21

initiative power to enact legislation concerning workers' compensation.[10]

It is also important to remember that, by its nature, " 'the California Legislature possesses *plenary* legislative authority except as specifically limited by the California Constitution.' " (*Howard Jarvis Taxpayers Assn. v. Padilla* (2016) 62 Cal.4th 486, 498; see *Yosemite L. Co. v. Industrial Acc. Com.* (1922) 187 Cal. 774, 780 ["Nothing is added to the force of [article XIV, section 4] by the use of the word 'plenary.' If the legislature has power to do a certain thing, its power to do it is always plenary. It is merely surplus verbiage"].) Thus, unlike grants of power to Congress in the United States Constitution, the voters had no need to give a specific power to the Legislature to allow that body to legislate on workers' compensation. (*City and County of San Francisco v. Workers' Comp. Appeals Bd.*, *supra*, 22 Cal.3d at p. 114 ["[e]ven without such specific authorization [in article XIV,

---

[10] The dissenting opinion cites the statement in *Hustedt*, *supra*, 30 Cal.3d at p. 343, fn. 11, that *Mathews* interpreted the paragraph in article XIV, section 4 ratifying and confirming the creation and existence of the WCAB and all its functions "to bar only the invalidation of 'basic features' of the workers compensation laws 'as they have existed since 1911.' " (Conc. & dis. opn., *post*, at p. 6.) While the language is perhaps ambiguous, the reference to "invalidation" suggests that *Hustedt* read *Mathews*, as we do, as holding only that article XIV, section 4 was not intended to render invalid any preexisting features of the workers' compensation system. If *Hustedt* intended to announce a sweeping holding that the 1918 workers' compensation system was beyond the Legislature's ability to change (which was unnecessary to resolve the dispute before it), we believe it would have said so in far more direct language.

section 4], the Legislature possesses the authority, under the now firmly established view of the concept of the police power, to adopt appropriate legislative measures for the protection of employees and their dependents"].) The only reason to enact article XIV, section 4 was to create an exemption from provisions elsewhere in the Constitution that might have been viewed at the time as preventing the enactment of certain features of such legislation. (See *Western Indemnity Co. v. Pillsbury* (1915) 170 Cal. 686, 725 (dis. opn. of Henshaw, J.) [espousing view that workers' compensation statute under prior version of art. XIV, § 4 violated 14th Amendment of United States Constitution]; see also *Bixby v. Pierno* (1971) 4 Cal.3d 130, 142 [describing courts' shift over time to give "less emphasis to outmoded rights of property and to shibboleths of freedom of contract"]; Proposed Amendments to the Constitution of the State of California, with Legislative Reasons for and against Adoption Thereof, Gen. Elec. (Oct. 10, 1911), argument in favor of Sen. Const. Amdt. No. 32 [prior version of art. XIV, § 4 was enacted to abrogate court decisions holding that compulsory workers' compensation law was a taking of property without due process], available at <https://repository.uchastings.edu/ca_ballot_props/24/> [as of Mar. 13, 2023].) Nothing in the initiative power otherwise prevented the enactment of workers' compensation legislation, so article XIV, section 4 did not repeal any aspect of the initiative power.

To plaintiffs, Proposition 22 is inconsistent with article XIV, section 4 because the benefits that Proposition 22 gives app-

23

based drivers do not amount to a "complete system of workers' compensation" as defined in article XIV, section 4.[11]  But article XIV, section 4 does not require every worker to be covered by workers' compensation.  (*Facundo-Guerrero v. Workers' Comp. Appeals Bd.* (2008) 163 Cal.App.4th 640, 650 [intent of article XIV, section 4 "was not to impose a lawmaking mandate upon the Legislature, but to endow that body expressly with exclusive and 'plenary' authority to determine the contours and content of our state's workers' compensation system, including the power to

_____

[11] The portion of article XIV, section 4 relevant to plaintiffs' argument that Proposition 22 does not provide a "complete" compensation system provides as follows:  "A complete system of workers' compensation includes adequate provisions for the comfort, health and safety and general welfare of any and all workers and those dependent upon them for support to the extent of relieving from the consequences of any injury or death incurred or sustained by workers in the course of their employment, irrespective of the fault of any party; also full provision for securing safety in places of employment; full provision for such medical, surgical, hospital and other remedial treatment as is requisite to cure and relieve from the effects of such injury; full provision for adequate insurance coverage against liability to pay or furnish compensation; full provision for regulating such insurance coverage in all its aspects, including the establishment and management of a state compensation insurance fund; full provision for otherwise securing the payment of compensation; and full provision for vesting power, authority and jurisdiction in an administrative body with all the requisite governmental functions to determine any dispute or matter arising under such legislation, to the end that the administration of such legislation shall accomplish substantial justice in all cases expeditiously, inexpensively, and without incumbrance of any character; all of which matters are expressly declared to be the social public policy of this State, binding upon all departments of the state government."  (Cal. Const., art. XIV, § 4.)

24

limit benefits"]; *Wal-Mart Stores v. Workers' Comp. Appeals Bd.* (2003) 112 Cal.App.4th 1435, 1442 [Constitution does not make a right to workers' compensation benefits "absolute"; Legislature can choose to exclude certain workers].)[12]  The Legislature or the voters may exclude app-based drivers entirely from workers' compensation benefits (cf. Lab. Code, § 3352, subd. (a) [excluding various types of workers from the definition of "employee" for

---

[12] The dissenting opinion concedes that courts have long given the Legislature "wide berth" to revise the worker's compensation system, but it contends that no case has held that the Legislature may eliminate basic features of the pre-1918 workers' compensation system.  (Conc. & dis. opn., *post*, at pp. 58-59.)  Apart from *Wal-Mart Stores v. Workers' Comp. Appeals Bd.*, there is also *Stevens v. Workers' Comp. Appeals Bd.* (2015) 241 Cal.App.4th 1074, 1094–1096, which held that article XIV, section 4 did not prevent the Legislature from taking away the authority of the WCAB to determine medical necessity of treatment, which it had held since 1917 (Stats. 1917, ch. 586, § 9(a), p. 837), and vesting it instead in an independent medical review organization whose determinations are effectively final. (Accord, *Ramirez v. Workers' Comp. Appeals Bd.* (2017) 10 Cal.App.5th 205, 226; see also *Rio Linda Union School Dist. v. Workers' Comp. Appeals Bd.* (2005) 131 Cal.App.4th 517, 525–527, 532 [workers' compensation rights are wholly statutory, so Legislature could change existing law (which dated to 1917, see Stats. 1917, ch. 586, § 3(4), p. 833) and require apportionment of disability based on causation and pre-existing conditions].)  The dissenting opinion recognizes that the WCAB's authority to resolve disputes between employers and employees over medical necessity of treatment was a basic feature of the pre-1918 law. (Conc. & dis. opn., *post*, at p. 46.)  By contrast, no case has ever held that article XIV, section 4 prevented the Legislature from changing basic features of the pre-1918 workers' compensation system, as the dissenting opinion would hold.

purposes of workers' compensation]), so the relative insufficiency of Proposition 22's benefits is of no constitutional moment.

In their last argument, plaintiffs contend that article XIV, section 4's reference to the Legislature should not be read as including the initiative power because doing so changes the scope of the article XIV, section 4 power.  They reason that the Legislature on its own could not restrict its own future power, while an initiative like Proposition 22 can.  (*In re Collie* (1952) 38 Cal.2d 396, 398.)  Initiatives do bind the Legislature by virtue of article II, section 10(c), discussed further, *post*, in a way that the Legislature cannot bind itself.  (*Rossi v. Brown* (1995) 9 Cal.4th 688, 715–716.)  But the same argument could be made about any reference to the Legislature in the Constitution, which would completely defeat the long-established rule that references to the Legislature should be read as including the initiative power.  (*McPherson, supra,* 38 Cal.4th at p. 1043.)  We therefore reject this argument.

We turn finally to what the dissenting opinion deems article XIV, section 4's "particularly notable" declaration that the workers' compensation scheme shall be "binding upon all departments of the state government."  (Conc. & dis. opn., *post*, at p. 39, quoting Cal. Const., art. XIV, § 4).  Based on its interpretation of that phrase, the dissent asserts that when the people adopt an initiative statute, they "are encompassed within the phrase 'all departments of State Government.' "  (Conc. & dis. opn., *post*, at p. 39.)  From that premise, the dissent then concludes that when there is a conflict between a legislative

26

enactment and an initiative statute relating to workers' compensation, the electorate is bound by the Legislature's view of workers' compensation policy. (*Id.* at pp. 40–41, 44.) The dissenting opinion cites nothing to support its assertion that the people enacting an initiative constitute a "department of the state government" or its conclusion that the phrase "binding upon all departments of the state government" was intended to convey a limitation on the initiative power. In actuality, this phrase appears to have been intended only to mean that the workers' compensation system applies to the state and local governments as employers. (*Bautista v. State of California* (2011) 201 Cal.App.4th 716, 726; *Sacramento v. Industrial Acc. Com.* (1925) 74 Cal.App. 386, 395.)

A second, more fundamental problem is that construing "departments of the State government" to include the electorate—one premise for the dissenting opinion's conclusion that article XIV, section 4 limits the initiative power—runs afoul of *California Cannabis Coalition v. City of Upland*, *supra*, 3 Cal.5th 924. There, our Supreme Court rejected the City's contention that a constitutional provision limiting the authority of "local government" with respect to taxes should be construed to mean that such a limitation applies to the *electorate* when it enacts a tax-related initiative statute. (*Id.* at pp. 930–931 [construing article XIII C].) Not only did the court reason that construing "local government" to include the electorate was contrary to the term's common understanding (*California Cannabis Coalition*, at p. 937), the court also repeatedly

27

instructed that there must be some "unambiguous indication that a provision's purpose was to constrain the initiative power" before such a limitation would be imposed. (*Id*. at p. 945; see *id*. at p. 946 ["the best way to implement our oft-repeated references to the importance of the initiative is to avoid presuming that a provision constrains that power without a *clear statement or equivalent evidence* that such was the provision's intended purpose" (italics added)], 948 ["Unless a provision *explicitly constrains* the initiative power or otherwise provides a *similarly clear indication* that its purpose includes constraining the voters' initiative power, we will not construe provisions as imposing such limitations" (italics added)].)

Similar to the phrase "local government" in the constitutional provision at issue in *California Cannabis Coalition*, article XIV, section 4's reference to "departments of the state government" contains no unambiguous indication that the phrase was intended to include the electorate and thereby constrain the people's initiative power. This does not make the voters "exogenous" to our plan of government (conc. & dis. opn., *post*, at p. 39); the California Constitution plainly provides for the initiative power, after all. This merely recognizes that a reference to "State government" or its departments does not naturally include the voters.

We therefore conclude that Proposition 22 does not violate article XIV, section 4.

28

## III. Single-subject Rule

In addition to challenging the entirety of Proposition 22 based on article XIV, section 4, plaintiffs argued below that section 7465(c)(4) violates article II, section 8, subdivision (d) of the Constitution, which provides that "[a]n initiative measure embracing more than one subject may not be submitted to the electors or have any effect." Plaintiffs asserted that section 7465(c)(4) violates this single-subject rule because it is not reasonably germane to the purpose of Proposition 22 and imposes restrictions not substantively addressed in the initiative. While directed at only section 7465(c)(4), plaintiffs' challenge still aims at the complete invalidation of Proposition 22 because "when an initiative measure violates the single-subject rule, severance is not an available remedy." (See *Senate of the State of Cal. v. Jones* (1999) 21 Cal.4th 1142, 1168.)

The Supreme Court's "jurisprudence in this area is well developed." (*Briggs, supra*, 3 Cal.5th at p. 828.) It has " 'upheld a variety of initiative measures in the face of a single-subject challenge, emphasizing that the initiative process occupies an important and favored status in the California constitutional scheme and that the single-subject requirement should not be interpreted in an unduly narrow or restrictive fashion that would preclude the use of the initiative process to accomplish comprehensive, broad-based reform in a particular area of public concern.' " (*Ibid*.) " '[T]he single-subject provision does not require that each of the provisions of a measure effectively interlock in a functional relationship. [Citation.] It is enough

29

that the various provisions are reasonably related to a common theme or purpose.' " (*Ibid*.) "The 'reasonably germane' standard is applied 'in an accommodating and lenient manner so as not to unduly restrict . . . the people's right to package provisions in a single bill or initiative.' " (*Id*. at p. 829.)

Section 7465 is the only statutory section in the article titled "Amendment." Subdivision (a) of section 7465 allows the Legislature to amend Proposition 22 under certain conditions, including that any amendments must be enacted by a seven-eighths majority and must further the purpose of the initiative. (§ 7465, subd. (a).) Under the Constitution, the Legislature may also amend an initiative statute if the voters subsequently approve it. (Cal. Const., art. II, § 10, subd. (c).)

Section 7465(c)(4) defines a specific type of legislation that would constitute an amendment of Proposition 22, stating, "Any statute that authorizes any entity or organization to represent the interests of app-based drivers in connection with drivers' contractual relationships with network companies, or drivers' compensation, benefits, or working conditions, constitutes an amendment" to the initiative. Section 7465(c)(4)'s language is broad, but it is undisputed that if the Legislature seeks to enact a law allowing app-based drivers to collectively bargain, it must comply with the requirements for amendments to the initiative. Such a legislative enactment would be necessary for drivers to collectively bargain because antitrust law prevents independent contractors from doing so unless they obtain specific state authorization. (*Chamber of Commerce of the USA v. City of*

30

*Seattle* (9th Cir. 2018) 890 F.3d 769, 780–790 (*Chamber of Commerce*); 15 U.S.C. § 17.)

Plaintiffs alleged and the trial court agreed that section 7465(c)(4) does not relate to the purposes of Proposition 22, as specifically set forth in section 7450:  protecting app-based drivers' rights to work as independent contractors, protecting their right to have flexibility in their schedules and locations, offering them new benefits and protections, and improving public safety relating to app-based drivers.  (§ 7450, subds. (a)–(d).)  We conclude to the contrary that section 7465(c)(4) is " 'reasonably related to a common theme or purpose' " of the initiative and thus satisfies the single-subject rule, given the accommodating and lenient fashion in which the Supreme Court has instructed us to apply it.  (*Briggs*, *supra*, 3 Cal.5th at p. 828.)

Proposition 22's common theme or purpose is, as interveners argue, the creation of a new balance of benefits and obligations for app-based drivers in lieu of either traditional employment or traditional independent contractor status.  Section 7465(c)(4) is reasonably germane to this subject because it relates to drivers' ability to change that balance by limiting the Legislature's ability to authorize collective bargaining over drivers' compensation, benefits, or working conditions.  Stated slightly more generally, Proposition 22's overarching single subject is regulation of the relationships between app-based drivers and network companies, and section 7465(c)(4)'s restrictions on the Legislature's ability to allow drivers to collectively bargain relate to those relationships.

31

The trial court took a different approach to the analysis, which plaintiffs support on appeal. Rather than identifying a single purpose for the entire law, plaintiffs recite Proposition 22's four declared purposes: classifying drivers as independent contractors, protecting driver independence, providing new benefits, and protecting public safety. (§ 7450, subds. (a)–(d).) Like the trial court, they point out that section 7465(c)(4)'s restrictions on the enactment of laws allowing collective bargaining have no relationship to the rest of the initiative's sections and are not necessary to achieve its four stated purposes. Plaintiffs resist interveners' definition of Proposition 22's purpose as comprehensive reform of app-based drivers' relationships with network companies, arguing that we should rely only on the express statements of Proposition 22's purpose in its title, findings, and declarations.

Given their argument here, plaintiffs are correct that we should draw Proposition 22's theme or purpose from its stated aims, but plaintiffs' framing of their single-subject challenge requires us to summarize and derive from Proposition 22's multiple purposes a single, overarching theme or purpose against which to measure section 7465(c)(4). This is how the Supreme Court has conducted the single-subject analysis, including in the cases that plaintiffs cite in support of their argument. (*Briggs*, *supra*, 3 Cal.5th at p. 831 [identifying initiative's purpose as "an extensive reform of the entire system of capital punishment to make it more efficient, less expensive, and more responsive to the rights of victims"]; *Manduley v. Superior Court* (2002) 27 Cal.4th

537, 576 ["Addressing the problem of juvenile crime and gang-related crime properly can be considered the common purpose of Proposition 21"]; *Legislature v. Eu* (1991) 54 Cal.3d 492, 512 ["The unifying theme or common purpose of Proposition 140 is incumbency reform"].)  *League of Women Voters v. Eu* (1992) 7 Cal.App.4th 649, 654–655, which plaintiffs also claim supports their position, compared the process of identifying a measure's purpose to the arithmetic involved in adding unlike fractions, in that courts should "identify the lowest common denominator of the various provisions of the initiative, i.e., the most narrowly defined object or purpose which nevertheless is sufficiently broad to encompass all such provisions." (*Id.* at p. 659.)  Such an approach starts with the provisions of an initiative and draws from them the overall theme or purpose of the entire measure.

Plaintiffs' piecemeal comparison of section 7465(c)(4) to each of the initiative's separate purposes misses the forest for the trees.  Two of Proposition 22's stated purposes, classification of drivers as independent contractors and protecting driver independence, relate to each other, but the other two, driver benefits and public safety, do not.  (§ 7450, subds. (a)–(d).)  We therefore cannot give each of these purposes equal significance, as plaintiffs urge us to do, because doing so would mean Proposition 22 has three purposes and therefore three subjects.  Additionally, plaintiffs' approach would make the single-subject inquiry unworkable.  Initiatives commonly state multiple purposes or motivating concerns, between their titles, preambles, findings, declarations, and substantive provisions.  Proposition 22

is relatively simple in this regard with four purposes. Other initiatives state many more, like the proposition at issue in *Briggs*, which set out 11 findings and declarations. (*Briggs*, *supra*, 3 Cal.5th at p. 823; Voter Information Guide, Gen. Elec. (Nov. 8, 2016) text of Prop. 66, § 2, pp. 212–213.) Eschewing the identification of initiatives' common or dominant purpose and conducting a multivariate analysis, as plaintiffs advocate, is not feasible. To assess their claim that section 7465(c)(4) represents a different subject than the remainder of the initiative, we must elucidate from the initiative's stated purposes a single theme or subject against which we can evaluate section 7465(c)(4).

In a fallback argument, plaintiffs contend that even if Proposition 22's theme or subject can be isolated from its stated purposes, its theme is the classification of app-based drivers for purposes of employment law and section 7465(c)(4) does not relate to classification. This description of Proposition 22's subject is too narrow. Classification is just one of the initiative's stated purposes, and only two of the initiative's statutory sections relate to it. (§§ 7451 [reclassifying drivers], 7452.5 [nothing else in Proposition 22 should be construed as altering the classification of app-based drivers as independent contractors].) Most of the rest of the initiative's statutory sections are devoted to achieving its other stated purposes by detailing the benefits that app-based drivers must receive and public safety requirements with which they must comply. (§§ 7454–7462.) These sections do not relate to classification. Because these provisions represent the bulk of the initiative, plaintiffs'

34

statement of the initiative's overall subject cannot be correct. Moreover, even if classification could be said to be Proposition 22's single subject, that determination would not help plaintiffs. If the initiative's benefits and public safety requirements sections relate to classification (perhaps because they provide benefits and obligations to replace those that app-based drivers would have as employees), then section 7465(c)(4), too, relates to classification because it concerns the Legislature's authority to change the procedures by which drivers can increase the replacement benefits.

Plaintiffs' remaining arguments are unavailing. First, they argue that section 7465(c)(4) restricts the Legislature's power to allow drivers to collectively bargain even though the rest of the initiative, which plaintiffs describe as its "operative" provisions, does not mention representation of drivers, either individually or collectively. We have more to say about the relationship between section 7465(c)(4) and the rest of Proposition 22, *post*, but for purposes of the single-subject rule, plaintiffs' distinction between section 7465(c)(4) and the initiative's operative provisions is irrelevant. Plaintiffs cite no authority that requires different provisions of an initiative to cross-reference each other, and the law is to the contrary. "[A] measure's separate provisions have been considered to be reasonably germane to each other within the meaning of the standard so long as all of the provisions are reasonably germane to a single common theme, purpose, or subject." (*Californians for an Open Primary v. McPherson* (2006) 38 Cal.4th 735, 764, fn. 29, italics omitted.)

Second, plaintiffs contend that collective bargaining is a separate subject because collective bargaining would not impair drivers' ability to set their own hours or work independently, and collective bargaining for increased benefits would not conflict with the benefits Proposition 22 provides, which are established as minimum benefits. (See, e.g., §§ 7454, subd. (a)(1)–(2) [requiring health care subsidy "greater than or equal to" certain reference standards], 7455, subd. (a) [setting "minimum" coverage for insurance].) But the single-subject test does not look at whether a provision is necessary for the rest of an initiative to function. Plaintiffs are in effect seeking to impose a requirement that an initiative's provisions must all functionally relate to one another. The Supreme Court has already rejected this argument. (*Briggs*, *supra*, 3 Cal.5th at p. 828 [" '[T]he single-subject provision does not require that each of the provisions of a measure effectively interlock in a functional relationship' "].)

Third, plaintiffs compare this case to *California Trial Lawyers Assn. v. Eu* (1988) 200 Cal.App.3d 351, 358 (*Trial Lawyers*), which held that an initiative violated the single-subject rule. The comparison is not apt. *Trial Lawyers* involved a challenge to an initiative titled "Insurance Cost Control Initiative of 1988," which consisted of 120 pages covering 67 sections. (*Trial Lawyers*, at pp. 354–355.) The initiative would have created "revolutionary" changes in insurance law, including creation of no-fault insurance for auto accidents, limiting recovery for injuries beyond the no-fault limits, reducing premiums for certain coverages, and limiting future insurance

36

regulation legislation. (*Id.* at pp. 355–356.) One section of the initiative, located "inconspicuously" at pages 52 and 53 of the measure, would have enacted a statute providing that public officials would not be required to disqualify themselves from any decisions affecting an insurer's interests based upon the insurer's campaign contributions. (*Id.* at p. 356.) The court found no possible connection between avoiding such disqualification and the general object and purpose of the initiative. (*Id.* at p. 359.) The court rejected the initiative supporter's argument that the provision was germane because both it and the rest of the initiative dealt generally with regulation of insurance industry practices. (*Id.* at pp. 359–360.) The court first noted that the express purpose of the initiative was to control insurance costs. (*Id.* at p. 360.) The court further concluded that the supporter's argument would mean that any two provisions that affected the business of insurance would comply with the single-subject rule, which the court found would "render the constitutional single-subject limitation nugatory." (*Ibid.*)

Proposition 22 is not like the measure at issue in *Trial Lawyers*. The only discernable relationship between the anti-disqualification provision of that initiative and the rest of the measure was that both had some effect on the business of insurance. (*Trial Lawyers*, *supra*, 200 Cal.App.3d at p. 360.) But as just discussed, section 7465(c)(4) relates to the rest of Proposition 22 because both concern the subject of app-based drivers' benefits, with the bulk of Proposition 22 establishing that drivers would not receive employee benefits and providing a

replacement set of benefits, and section 7465(c)(4) restricting the Legislature's ability to allow drivers to negotiate collectively to increase those benefits. Because of the "undeniably liberal nature of the standards which have been formulated" in the Supreme Court's cases, this connection is sufficient. (*Trial Lawyers,* at p. 359.)

Finally, plaintiffs seek to buttress their arguments by pointing out that the single-subject rule is intended to avoid voter confusion and the exploitation of the initiative process through the combination of disparate provisions which might not have commanded majority support if considered separately, which is known as logrolling. (*Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization* (1978) 22 Cal.3d 208, 231–232.) However, as plaintiffs admit, voter confusion and logrolling are not standalone bases for invalidating an initiative. "The single-subject rule is the method by which the state Constitution guards against" those risks, so we may examine only whether Proposition 22 satisfies the rule, without also examining whether it satisfies the purposes behind the rule. (*Kennedy Wholesale, Inc. v. State Bd. of Equalization* (1991) 53 Cal.3d 245, 255; accord, *California Gillnetters Assn. v. Department of Fish & Game* (1995) 39 Cal.App.4th 1145, 1162 & fn. 11.) While concerns about voters' understanding of section 7465(c)(4) may bear on our interpretation of the statute for the purposes of plaintiffs' separation of powers challenge, as we discuss *post*, these concerns are not sufficient to rescue plaintiffs' otherwise unpersuasive single-subject rule argument.

38

## IV.    Separation of Powers

We turn now to plaintiffs' separation of powers challenge with respect to sections 7465(c)(3) and (4).  We have already discussed section 7465(c)(4) in detail in relation to the single-subject rule.  Section 7465(c)(3) defines another class of legislation that constitutes an amendment to Proposition 22, namely, "[a]ny statute that prohibits app-based drivers from performing a particular rideshare service or delivery service while allowing other individuals or entities to perform the same rideshare service or delivery service, or otherwise imposes unequal regulatory burdens upon app-based drivers based on their classification status."  Plaintiffs argued in their petition that sections 7465(c)(3) and (4) are facially unconstitutional because they intrude on the judiciary's power to define what constitutes an amendment to Proposition 22, and that section 7465(c)(4) on its face unconstitutionally limits the Legislature's authority to enact related but distinct legislation.  The trial court found that section 7465(c)(3) passes constitutional muster but concluded that section 7465(c)(4) is invalid because it violates the separation of powers by intruding on the Legislature's powers.

As noted *ante*, section 7465 represents an exercise of the voters' power under article II, section 10(c) "to decide whether or not the Legislature can amend or repeal initiative statutes.  This power is absolute and includes the power to enable legislative amendment subject to conditions attached by the voters." (*California Common Cause v. Fair Political Practices Com.* (1990) 221 Cal.App.3d 647, 652, italics omitted.)  For lack of a better

39

term, we will refer to the area of law in which an initiative constrains the Legislature's legislative actions as the initiative's article II, section 10(c) shadow.

### A. Facial challenge

Interveners and the state first contend the trial court erred in holding section 7465(c)(4) invalid because plaintiffs fail to meet the standard for facial challenges, as they cannot show that section 7465(c)(4) is unconstitutional in all or almost all of its applications. We disagree.

"The standard for a facial constitutional challenge to a statute is exacting. It is also the subject of some uncertainty." (*Today's Fresh Start, Inc. v. Los Angeles County Office of Education* (2013) 57 Cal.4th 197, 218.) In the stricter formulation of the standard, "legislation is invalid only if it presents a total and fatal conflict with applicable constitutional prohibitions." (*T-Mobile West LLC v. City and County of San Francisco* (2019) 6 Cal.5th 1107, 1117, fn. 6.) This standard requires a challenger to " ' " 'establish that no set of circumstances exists under which the [law] would be valid.' " ' " (*American Civil Rights Foundation v. Berkeley Unified School Dist.* (2009) 172 Cal.App.4th 207, 216.) But other cases have " 'applied a more lenient standard, asking whether the statute is unconstitutional "in the generality or great majority of cases." ' " (*California School Boards Assn. v. State of California* (2019) 8 Cal.5th 713, 724.) "Either way, we consider only the text and purpose of the statute, and '[plaintiffs] cannot prevail by suggesting that in some future hypothetical situation

constitutional problems may possibly arise as to the particular application of the statute.' " (*Ibid.*, italics omitted.)

Interveners press for the application of the stricter standard and argue it is not met because they can imagine collective bargaining laws that would constitute amendments to Proposition 22, demonstrating that section 7465(c)(4) has at least some constitutional applications. For example, interveners argue that section 7465(c)(4) would be constitutional as applied to a statute authorizing mandatory collective bargaining over minimum hours that app-based drivers must work (see *Chamber of Commerce*, *supra*, 890 F.3d at pp. 777–778), since such a statute would amend Proposition 22 by taking away "the individual right of every app-based rideshare and delivery driver to have the flexibility to set their own hours for when, where, and how they work."[13] (§ 7450, subd. (b).)

As they did below, plaintiffs argue that by attempting to define what constitutes an amendment, sections 7465(c)(3) and (4) intrude on the judiciary's power to define Proposition 22's article II, section 10(c) shadow. Interveners' contention that plaintiffs' separation of powers challenge is not facial ignores this

_____

[13] Plaintiffs also argue that section 7465(c)(4) would prohibit the Legislature from allowing the Labor Commissioner or some other public entity to represent individual app-based drivers as to their contractual relationships with transportation and delivery network companies. Interveners do not offer examples of laws authorizing public representation of individual drivers that section 7465(c)(4) could constitutionally define as amendments to Proposition 22. Since the parties focus primarily on section 7465(c)(4) as a measure directed at collective bargaining, we do the same.

aspect of plaintiffs' argument, which does not depend on the content of any specific piece of legislation; rather, the mere existence of sections 7465(c)(3) and (4) completes the alleged intrusion. In other words, even if sections 7465(c)(3) and (4) would correctly declare some statutes to be amendments to Proposition 22, sections 7465(c)(3) and (4) would still violate the judiciary's exclusive right to make such determinations. Plaintiffs' separation of powers challenge based on this intrusion on the judiciary's power is therefore a facial one, even under interveners' argument.

As for plaintiffs' argument that section 7465(c)(4) intrudes on the Legislature's power, plaintiffs concede that interveners' hypothetical statute authorizing mandatory collective bargaining over minimum hours that app-based drivers must work would constitute an amendment to Proposition 22.[14] But they argue it would be an amendment even in the absence of section 7465(c)(4), so section 7465(c)(4) would be irrelevant in such a scenario. They urge us to disregard such situations and focus only on scenarios in which section 7465(c)(4) would be relevant. Thus, plaintiffs' facial attack on section 7465(c)(4) is more accurately described as an attack on section 7465(c)(4) in all instances in which it would declare a collective bargaining statute to be an amendment of

---

[14] In the trial court, plaintiffs contended that section 7465(c)(3) also intrudes on the Legislature's power, not just section 7465(c)(4). The trial court rejected this argument, and plaintiffs do not renew it on appeal. We express no opinion on this point or on whether such an argument would be cognizable as a facial challenge in the same manner as plaintiffs' contention that section 7465(c)(4) intrudes on the Legislature's power.

42

Proposition 22 that would not otherwise constitute an amendment.  Or, using the terminology we have adopted here, it is an attack on section 7465(c)(4) in every instance in which it affects Proposition 22's article II, section 10(c) shadow.

The Supreme Court endorsed plaintiffs' approach in a slightly different context in *American Academy of Pediatrics v. Lungren* (1997) 16 Cal.4th 307 (plur. opn. of George, C. J.). There, the Supreme Court noted, " '[l]egislation is measured for consistency with the Constitution by its impact on those whose conduct it affects. . . . The proper focus of constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant.' " (*Id.* at p. 345.)

*American Academy of Pediatrics v. Lungren* paired this rationale with its discussion of the more lenient standard for facial challenges, which some Courts of Appeal view as applicable only in fundamental rights cases, but the Supreme Court continues to treat the standard of review for facial challenges as generally unsettled.  (E.g., *T-Mobile West LLC v. City and County of San Francisco* (2016) 3 Cal.App.5th 334, 345, fn. 12 [rejecting application of lenient standard as appropriate only for First Amendment and abortion rights], affd. (2019) 6 Cal.5th 1107; *T-Mobile West LLC v. City and County of San Francisco, supra*, 6 Cal.5th at p. 1117, fn. 6 [declining to settle on a "precise formulation of the applicable standard"].)  Because plaintiffs' argument fits squarely within the rationale expressed in *American Academy of Pediatrics v. Lungren* for measuring the constitutionality of statutes by looking only at the behavior they

43

restrict, and nothing about that rationale is logically or inherently related to fundamental rights or the more lenient facial standard, *American Academy of Pediatrics v. Lungren* supports our conclusion that plaintiffs' challenge to section 7465(c)(4) may proceed as a facial attack.[15] (Cf. *San Francisco Apartment Assn. v. City and County of San Francisco* (2016) 3 Cal.App.5th 463, 486–488 [finding that plaintiffs had mounted a successful facial challenge to a local ordinance on preemption grounds by focusing on the instances where the local ordinance would in fact impermissibly impact plaintiffs' exercise of state law rights, not the ordinance in isolation].)

Our acceptance of plaintiffs' challenge as a facial one does not, as interveners argue, make a facial challenge the easiest challenge to assert rather than the hardest by ignoring the constitutional applications of the statute and focusing only on the unconstitutional ones. We are not ignoring the constitutional applications of the statute, but rather ignoring the applications where the statute would be irrelevant or, perhaps more accurately, immaterial. If every instance in which section 7465(c)(4) has a material impact is also one in which it is unconstitutional, then the law is facially infirm, even if it could be constitutionally applied as surplusage in other instances.

_____

[15] Although it is plaintiffs' burden to establish facial invalidity of section 7465(c)(4), we note that interveners and the state have not rebutted plaintiffs' challenge by pointing to any instance in which section 7465(c)(4) could constitutionally apply to legislation that would fall outside the "natural" article II, section 10(c) shadow.

### B. Ripeness

Interveners and the state next contend plaintiffs' separation of powers challenge is not ripe because the Legislature has not enacted any legislation that might constitute an amendment to Proposition 22. "The ripeness requirement, a branch of the doctrine of justiciability, prevents courts from issuing purely advisory opinions. [Citation.] It is rooted in the fundamental concept that the proper role of the judiciary does not extend to the resolution of abstract differences of legal opinion. It is in part designed to regulate the workload of courts by preventing judicial consideration of lawsuits that seek only to obtain general guidance, rather than to resolve specific legal disputes. However, the ripeness doctrine is primarily bottomed on the recognition that judicial decisionmaking is best conducted in the context of an actual set of facts so that the issues will be framed with sufficient definiteness to enable the court to make a decree finally disposing of the controversy. On the other hand, the requirement should not prevent courts from resolving concrete disputes if the consequence of a deferred decision will be lingering uncertainty in the law, especially when there is widespread public interest in the answer to a particular legal question." (*Pacific Legal Foundation v. California Coastal Com.* (1982) 33 Cal.3d 158, 170.)

The Supreme Court has applied a two-prong test for deciding whether a dispute is ripe, examining " 'the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.' " (*Pacific Legal Foundation v.*

*California Coastal Com.*, *supra*, 33 Cal.3d at pp. 171–174, italics omitted.) " 'Under the first prong, the courts will decline to adjudicate a dispute if "the abstract posture of [the] proceeding makes it difficult to evaluate . . . the issues" [citation], if the court is asked to speculate on the resolution of hypothetical situations [citation], or if the case presents a "contrived inquiry" [citation]. Under the second prong, the courts will not intervene merely to settle a difference of opinion; there must be an imminent and significant hardship inherent in further delay.' " (*Communities for a Better Environment v. State Energy Resources Conservation & Development Com.* (2017) 19 Cal.App.5th 725, 733–734.)

The fitness prong of this test indicates plaintiffs' separation of powers challenge to the initiative is ripe because the voters have already approved Proposition 22 and, as discussed *ante*, plaintiffs' challenge to it is a facial one for which concrete facts are unnecessary. (*Alliance for Responsible Planning v. Taylor* (2021) 63 Cal.App.5th 1072, 1082 ["Nothing precludes resolution of the controversy, as the facial allegation does not depend on the application of the measure to a particular petitioner or future County interpretation"].) Interveners emphasize that the Legislature has not enacted a statute that plausibly amends Proposition 22, so there is no statutory text to interpret to determine whether it changes the scope and effect of the initiative. But plaintiffs contend the definitions of amendments in sections 7465(c)(3) and (4) violate the separation of powers on their face, so there is no need to wait for the Legislature to enact a specific statute to evaluate plaintiffs' arguments.

46

The hardship prong also militates in favor of finding ripeness. Sections 7465(c)(3) and (4) are in effect, so they are already intruding on the judiciary's powers. Section 7465(c)(4) can also affect the Legislature's and stakeholders' political calculations, including those of labor organizations like plaintiff SEIU, about whether to try to pass a law allowing app-based drivers to collectively bargain or authorizing some other form of representation of individual drivers. The only three avenues for such legislation to become effective would be if the Legislature submits the legislation to the voters for approval, which is a costly undertaking; if the Legislature approves the legislation by a seven-eighths majority, which is a bar so high as to be virtually insurmountable; or if the Legislature passes such legislation by less than a seven-eighths majority and the courts subsequently agree that section 7465(c)(4) is unconstitutional, which is both time-consuming and difficult to predict. Given these problematic paths to effective legislation, the most likely outcome is that legislators would not even undertake the effort. This is a significant hardship justifying judicial resolution at this stage.

Interveners and the state argue that this type of chilling effect is insignificant because the Legislature regularly enacts laws even though the courts might find them to be amendments to initiatives. (See, e.g., *Amwest Surety Ins. Co. v. Wilson* (1995) 11 Cal.4th 1243, 1261 [rejecting Legislature's stated claim that a statute merely clarified the scope of an initiative].) However, interveners do not cite any law requiring a seven-eighths majority for passage, which imposes an apparently uniquely high

47

barrier to legislative action.  Besides, even if the chilling effect were not a significant hardship, the concrete nature of the parties' arguments here would still make the issue ripe for our resolution.  The Supreme Court has held that "the ripeness requirement does not prevent [the courts] from resolving a concrete dispute if the consequence of a deferred decision will be lingering uncertainty in the law, especially when there is widespread public interest in the answer to a particular legal question."  (*Hunt v. Superior Court* (1999) 21 Cal.4th 984, 998.)  Because the parties' dispute has enough specificity for judicial resolution at present, the uncertainty in the law that sections 7465(c)(3) and (4) create, as well as the public interest in the validity of Proposition 22, counsel in favor of proceeding to the merits of plaintiffs' arguments.

### *C. Merits*

Having disposed of interveners' and the state's prefatory arguments, we turn now to the merits of plaintiffs' separation of powers challenge to sections 7465(c)(3) and (4).

### 1.  Intrusion on judicial powers

Plaintiffs first argue that sections 7465(c)(3) and (c)(4)'s definitions of amendments intrude on the judiciary's power because only the judiciary has the authority to say what constitutes an amendment within the meaning of article II, section 10(c).

"The powers of state government are legislative, executive, and judicial.  Persons charged with the exercise of one power may not exercise either of the others except as permitted by this

48

Constitution." (Cal. Const., art. III, § 3.) " 'The judicial power is conferred upon the courts by the Constitution and, in the absence of a constitutional provision, cannot be exercised by any other body.' " (*McClung v. Employment Development Dept.* (2004) 34 Cal.4th 467, 472.) "[I]t is well established that it is a judicial function to interpret the law, including the Constitution." (*Schabarum v. California Legislature* (1998) 60 Cal.App.4th 1205, 1213; accord, *Raven v. Deukmejian* (1990) 52 Cal.3d 336, 354 [" 'The judiciary, from the very nature of its powers and means given it by the Constitution, must possess the right to construe the Constitution in the last resort' "].)

Because the definitions in sections 7465(c)(3) and (4) constitute an attempt to define the boundaries of Proposition 22's article II, section 10(c) shadow, sections 7465(c)(3) and (4) on their face intrude on the judiciary's authority to define the meaning of "amendment" in that section of the Constitution. The trial court determined otherwise because it read sections 7465(c)(3) and (4) as defining "amendment" only for purposes of the optional, seven-eighths majority procedure in section 7465, subdivision (a), not for article II, section 10(c). The trial court is correct that sections 7465(c)(3) and (4) only govern which amendments must comply with the conditions established in section 7465, subdivision (a). But section 7465, subdivision (a)'s power to set conditions on the Legislature's enactment of future legislation is the authority conferred by article II, section 10(c). If a statute does not qualify as an amendment of Proposition 22 within the meaning of the Constitution, the Legislature need

49

neither secure the voters' approval nor comply with the conditions in section 7465, subdivision (a). Sections 7465(c)(3) and (4)'s definitions of "amendment" as used in section 7465, subdivision (a) are thus necessarily also an attempt to define "amendment" as used in article II, section 10(c), which is impermissible because such authority rests solely with the judiciary.

## 2. Intrusion on legislative powers

Plaintiffs' argument that section 7465(c)(4) intrudes on the Legislature's authority, with which the trial court agreed, is slightly more intricate but also has merit. In determining whether the Legislature has intruded on the voters' initiative power, courts have devised several different definitions of what constitutes an amendment of an initiative under article II, section 10(c). Decisions have defined an amendment variously as " 'a legislative act designed to change an existing initiative statute by adding or taking from it some particular provision' " (*People v. Superior Court* (*Pearson*) (2010) 48 Cal.4th 564, 571), one that "prohibits what [an] initiative authorizes, or authorizes what the initiative prohibits" (*ibid.*), or one that "changes its scope and effect" (*Proposition 103 Enforcement Project v. Quackenbush* (1998) 64 Cal.App.4th 1473, 1486). But the Supreme Court has cautioned against using too broad of a formulation because, "despite the strict bar on the Legislature's authority to amend initiative statutes, judicial decisions have observed that this body is not thereby precluded from enacting laws addressing the general subject matter of an initiative. The

50

Legislature remains free to address a ' "related but distinct area" ' [citations] or a matter that an initiative measure 'does not specifically authorize or prohibit.' " (*People v. Kelly* (2010) 47 Cal.4th 1008, 1025–1026 & fn. 19, italics omitted (*Kelly*).) This admonition implicitly recognizes that the definition of an amendment for the purposes of article II, section 10(c) operates both to prevent the Legislature from " ' "undoing what the people have done, without the electorate's consent" ' " (*Kelly*, at p. 1025) and to demarcate the boundaries of the restrictions that an initiative places on the Legislature's broad authority to legislate.

Collective bargaining legislation would not necessarily amend Proposition 22 under any of these definitions. Apart from section 7465(c)(4), no other provision of Proposition 22 directly concerns the procedures for driver representation or collective bargaining. The mere classification of drivers as independent contractors is not determinative of their ability to collectively bargain, as independent contractors can, in some circumstances, collectively bargain. (See *Chamber of Commerce*, *supra*, 890 F.3d at pp. 780–790; Welf. & Inst. Code, §§ 10420.5, 10423 [authorizing family child care providers to appoint organizations to represent them without making such providers employees].) Likewise, the benefits and obligations that Proposition 22 provides and imposes are established as minimums, not maximums, so nothing prevents drivers from negotiating for more, collectively or individually. (See, e.g., §§ 7454, subd. (a)(1)– (2) [requiring health care subsidy "greater than or equal to" certain amounts], 7455, subd. (a) [setting "minimum" coverages

51

for insurance], 7458, subd. (e) [nothing in statute "shall be interpreted to prevent a network company from imposing additional standards relating to criminal history"].)  By extending Proposition 22's article II, section 10(c) shadow to bar legislation on subjects which Proposition 22 does not otherwise directly address, section 7465(c)(4) intrudes on the Legislature's authority to address a " ' "related but distinct area" ' " or a matter that Proposition 22 " 'does not specifically authorize or prohibit.' " (*Kelly*, *supra*, 47 Cal.4th at pp. 1025–1026, italics omitted; cf. *People v. Nash* (2020) 52 Cal.App.5th 1041, 1059–1060 [legislation changing the bases for murder liability did not amend initiative that mandated increased sentences for murder convictions].)  On its face, section 7465(c)(4) therefore violates the separation of powers for this reason as well.

### 3.  Interveners' and the state's arguments

Interveners do not defend sections 7465(c)(3) and (4) as written and instead downplay them by construing them as merely statements of intent, precatory declarations of the voters' views of what constitutes an amendment.[16]  Interveners analogize sections 7465(c)(3) and (4) to provisions the Legislature commonly deploys when amending initiative statutes.  They cite, for example, *Amwest Surety Ins. Co. v. Wilson*, *supra*, 11 Cal.4th

---

[16] Although plaintiffs renewed their separation of powers challenge to section 7465(c)(3) in their respondents' brief, interveners do not mention section 7465(c)(3) in their reply and discuss only section 7465(c)(4).  But interveners defended section 7465(c)(3) and (4) in the trial court on the same basis on which they defend section 7465(c)(4) on appeal, so we mention both section 7465(c)(3) and (4) in our discussion of their argument.

at page 1260, which dealt with a statute declaring "that the act 'furthers the purpose of Proposition 103 by clarifying the applicability of the proposition to surety insurance.' " (See *Proposition 103 Enforcement Project v. Quackenbush*, *supra*, 64 Cal.App.4th at p. 1481 [considering a statute stating, " 'The Legislature finds and declares that this statute furthers the purpose of Proposition 103,' " italics omitted].)

Interveners' construction of sections 7465(c)(3) and (4) is not plausible. Questions of purpose are suitable for precatory declarations, since they turn on questions of legislative intent and will vary from one initiative to another. The Legislature's or the voters' input could be relevant when discerning such intent. Thus, there is no apparent issue with section 7465(c)(1)'s definition of Proposition 22's purposes and section 7465(c)(2)'s declaration that a statute that amends section 7451—which defines app-based drivers as independent contractors—does not further those purposes.

Unlike sections 7465(c)(1) and (2) or the legislative statements that interveners cite, however, sections 7465(c)(3) and (4) do not concern Proposition 22's purposes or what would further those purposes. Sections 7465(c)(3) and (4) address the distinct question of what constitutes an amendment of Proposition 22. (See *O.G. v. Superior Court* (2021) 11 Cal.5th 82, 99–100 [issues of whether a statute amends an initiative and whether amendments further initiative's purpose are separate].) That question is governed by standards announced in numerous judicial decisions over the years. By purporting to declare what

53

types of enactments would constitute amendments subject either to the constitutional alternative of voter approval or section 7465, subdivision (a)'s strict seven-eighths majority requirement (and associated procedural conditions), sections 7465(c)(3) and (4) seek to bypass this jurisprudence or declare what satisfies it, to the exclusion of the courts.  To the extent that section 7465(c)(4) seeks to cast a broader article II, section 10(c) shadow than the otherwise applicable judicial definitions of legislative amendments, it also intrudes on the Legislature's authority.

Interveners also contend that plaintiffs' argument that section 7465(c)(4) intrudes on the Legislature's authority is a single-subject argument in disguise and an attempt to sidestep the lenient single-subject standard in favor of a "stricter (but undefined and unprecedented) subject-based limitation on the initiative power."  They contend that if section 7465(c)(4) satisfies the single-subject rule, there is no basis to distinguish it from the rest of the initiative for purposes of the separation of powers analysis.  But the Supreme Court in *Kelly*, *supra*, 47 Cal.4th at pages 1025–1026 and footnote 19, recognized the "related but distinct" standard and both the Supreme Court and the Courts of Appeal continue to apply it, so it is hardly undefined or unprecedented.  (E.g., *People v. Superior Court* (*Pearson*), *supra*, 48 Cal.4th at p. 573; *People v. Steward* (2021) 63 Cal.App.5th 895, 899.)  In addition, the single-subject rule and the separation of powers are analytically distinct and serve different purposes, so there is no reason to allow the former to swallow the latter. The single-subject analysis intentionally "is applied 'in an

54

accommodating and lenient manner so as not to unduly restrict . . . the people's right to package provisions in a single bill or initiative.' " (*Briggs, supra*, 3 Cal.5th at p. 829.)  By contrast, the separation of powers doctrine is intended to protect the Legislature's sphere of control, to ensure that it "remains free to enact laws addressing the general subject matter of an initiative, or a 'related but distinct area' of law that an initiative measure 'does not specifically authorize or prohibit.' " (*Kelly*, at p. 1026, fn. 19, italics omitted.)  Our agreement with interveners that Proposition 22 complies with the single-subject rule does not free us of our obligation to enforce the separation of powers.

Interveners further argue that prohibiting the voters from expressing their views on the types of legislation that would be subject to an initiative's amendment process will discourage voters from allowing amendments at all in the future, but we are not convinced.  Sections 7465(c)(3) and (4) are apparently unique in the annals of initiative statutes.  Voters chose to permit amendments of initiatives for decades before Proposition 22.  It seems likely they will continue do so even though we now declare sections 7465(c)(3) and (4) invalid.  We also question whether voters allow the Legislature to amend their initiative measures as a sort of gift or a consolation prize, as interveners' argument implies.  Rather, voters likely permit amendments so that the Legislature can close loopholes, fix problems, and tweak initiative statutes to meet unexpected circumstances.  Declaring sections 7465(c)(3) and (4) to be unconstitutional attempts to expand

Proposition 22's article II, section 10(c) shadow will not eliminate or reduce these incentives.

For its part, the state at least reads sections 7465(c)(3) and (4) as exactly what they purport to be: attempts to define certain types of legislation that will constitute amendments of the initiative. But the state strays when it maintains that sections 7465(c)(3) and (4) are nonetheless proper. The state contends that legislation can amend an initiative even without altering its text and Proposition 22 regulates collective bargaining (albeit without saying so directly), so section 7465(c)(4) appropriately declares that new legislation authorizing collective bargaining would change the initiative's effect.[17] The state believes Proposition 22 regulates app-based drivers' ability to collectively bargain by classifying them as independent contractors, who, as a matter of law, cannot collectively bargain.

The state does not meaningfully respond to plaintiffs' argument that sections 7465(c)(3) and (c)(4) interfere with the judiciary's role to determine what constitutes an amendment within the meaning of article II, section 10(c). And the state's attempt to rebut plaintiffs' argument regarding section 7465(c)(4)'s infringement on the Legislature's powers is flawed. We have no quarrel with the principle that legislation can amend an initiative without expressly changing its wording, but that

---

[17] While the state treats section 7465(c)(4) as dealing only with collective bargaining, by its terms the provision would also apply to legislation authorizing other forms of representation of app-based drivers, including representation on an individual basis. (See fn. 13, *ante*.)

principle has no application here. As discussed *ante*, Proposition 22 does not directly regulate collective bargaining. And as noted, independent contractors are not entirely barred from collectively bargaining, so long as the Legislature enacts a law that satisfies the requirements for state action immunity to antitrust law. Section 7465(c)(4) therefore extends more broadly than Proposition 22's natural article II, section 10(c) shadow. Additionally, as several election law professors point out in an amicus brief, the voters would have had little reason to obliquely call out potential collective bargaining statutes in section 7465(c)(4) as amendments to the initiative if Proposition 22's substantive provisions already addressed that issue. If there were any doubt about whether the initiative's classification of app-based drivers as independent contractors foreclosed the possibility of collective bargaining, the far more direct way to address the issue would be to add a provision expressly saying so. The only discernable reason to include section 7465(c)(4) was to expand the scope of the initiative's article II, section 10(c) shadow beyond Proposition 22's substantive provisions.

In a variation on the state's argument, interveners contend in their reply brief that we could interpret section 7465(c)(4) itself as a form of substantive regulation. In this view, because app-based drivers cannot collectively bargain in the absence of an authorizing statute and there is presently no such law, section 7465(c)(4)'s restriction on the enactment of such a law effectively locks in place the status quo of drivers not being able to collectively bargain.

57

Treating section 7465(c)(4) as equivalent to a direct pronouncement that app-based drivers cannot collectively bargain presents even more difficulties than the other interpretations. To begin with, this approach is inconsistent with the text of the initiative. Section 7465(c)(4) is the only section contained in an article titled "Amendment." (*People v. Garfield* (1985) 40 Cal.3d 192, 199 [titles are "a useful guide in determining the intended scope of legislation," but not the only one].) And by its terms, section 7465(c)(4) discusses only the content of future legislation. It does not affirmatively state that app-based drivers cannot collectively bargain or that the Legislature cannot allow a public entity to represent them on an individual basis.

Even if section 7465(c)(4)'s text could be read to imply that drivers may not collectively bargain, there is no indication that the voters intended section 7465(c)(4) to operate in this fashion. " ' "[I]n the case of a voters' initiative statute . . . we may not properly interpret the measure in a way that the electorate did not contemplate: the voters should get what they enacted, not more and not less." ' " (*People v. Valencia* (2017) 3 Cal.5th 347, 375.) Section 7465(c)(4) does not use the phrase "collective bargaining," even though all the parties here acknowledge that restricting collective bargaining was the provision's aim. Nor does such an intent appear in Proposition 22's prefatory findings and statements of purpose. The Attorney General did not identify such a restriction as one of the initiative's effects, either in the original circulating title and summary or in the revised

58

title and summary included in the voter guide. (Proposition 22, at p. 2, available at <https://repository.uchastings.edu/ca_ballot_inits/2165/> [as of Mar. 13, 2023]; Voter Guide, *supra*, title and summary of Prop. 22, p. 56.) Nor did the Legislative Analyst. (Voter Guide, *supra*, analysis of Prop. 22, pp. 56–57.) Nor did the arguments for and against the initiative.[18] (*Id.* at pp. 58–59.)

To paraphrase our Supreme Court's remarks about a different initiative, "[w]e recognize that the materials in the ballot pamphlet may not touch on every aspect of an initiative, no

_____

[18] Interveners ask us to judicially notice a tweet from the campaign against Proposition 22 and a webpage maintained by that campaign that they claim demonstrate the voters understood that Proposition 22 would affect app-based drivers' ability to collectively bargain. Assuming for the sake of argument that these materials are properly subject to notice, they do not change our analysis. These materials predicted that "Proposition 22 would make it almost impossible for workers to have legal protections if they want to collectively bargain." But they did not describe whether this would come from classifying app-based drivers as independent contractors, thereby requiring an act by the Legislature to enable collective bargaining, or from the section 7465(c)(4) limitations on such legislation. The tweet and webpage therefore do not demonstrate that voters understood the effect of section 7465(c)(4).

Interveners also ask us to notice a webpage from an online encyclopedia that they contend demonstrates that Proposition 22 received widespread publicity and public discussion. This webpage was not submitted to the trial court, so we deny this request. (*Haworth v. Superior Court* (2010) 50 Cal.4th 372, 379, fn. 2 [" 'Reviewing courts generally do not take judicial notice of evidence not presented to the trial court' absent exceptional circumstances"].) This webpage also does not demonstrate anything about which specific aspects of Proposition 22 received publicity or discussion.

59

matter how minor. 'A statute, of course, must prevail over any summary. Were it not so, no statute could ever be enacted whole and entire. For every summary, by definition, is incomplete.' [Citation.] When, for example, an initiative contains a clear and unambiguous provision that, because of its relatively limited significance, is not mentioned in ballot summary or arguments, the absence of such a reference will not nullify its effectiveness. Here, however, the language of Proposition [22] is not free from ambiguity. And the application of its definition of [an amendment regulating app-drivers' ability to collectively bargain] is a matter of such substantial import that the voters could reasonably expect that, if Proposition [22] applied [in such a way], the ballot materials would mention it." (*People v. Valencia*, *supra*, 3 Cal.5th at p. 364, fn. 6.)

Finally, we are reluctant to accept section 7465(c)(4) as an indirect form of substantive regulation because of the troubling implications for the initiative process. Treating section 7465(c)(4)'s ostensibly procedural regulation of the amendment process as equivalent to a direct statement that app-based drivers cannot collectively bargain would encourage gamesmanship and reward initiative proponents for drafting confusing, or even outright misleading, initiatives. Adhering to the plain text of initiatives' enactments will instead help ensure that proponents draft clear and intelligible proposals for the voters' consideration.

The state and interveners emphasize that we must jealously guard the initiative power. But our duty to guard the

initiative power works both ways; "we guard this power with both swrod and shield. We must not only protect against interference with its proper exercise, but must also strike down efforts to exploit the power for an improper purpose." (*Widders v. Furchtenicht* (2008) 167 Cal.App.4th 769, 785.) We do the voters no favors by upholding a provision that either unconstitutionally intrudes on the powers of the judiciary and the Legislature or whose effect was unclear and not called to their attention.

The state and interveners also invoke the doctrine of constitutional avoidance, asking us to resolve all doubts in favor of the validity of section 7465(c) and to construe it in a way that avoids constitutional conflicts. (*California Redevelopment Assn. v. Matosantos* (2011) 53 Cal.4th 231, 253 [courts avoid "constitutional conflicts whenever possible by construing legislative enactments strictly against the impairment of [courts'] constitutional jurisdiction"]; *Briggs*, *supra*, 3 Cal.5th at pp. 857–859 [construing plainly mandatory provision in initiative as directive, in part to avoid separation of powers concerns].) But this does not allow us to simply pretend that Proposition 22 regulates collective bargaining, as the state suggests, when the text does not reasonably admit of such a construction. The doctrine of constitutional avoidance does not allow us to clothe the emperor in such a fashion.

We could perhaps construe section 7465(c)(4) as precatory, as interveners urge, even though its plain language is to the contrary. (See *Briggs*, *supra*, 3 Cal.5th at pp. 857–859.) But that would not meaningfully change the result. If section 7465(c)(4)

61

were a mere declaration of the voters' intent that the initiative forbids app-based drivers from collectively bargaining, it might survive constitutional scrutiny on its face.  However, any court to examine the question of whether Proposition 22 actually restricts the Legislature's authority to authorize collective bargaining would very likely disregard such a statement of intent, since nothing in the text of the rest of the initiative supports it, as discussed *ante*.  (*O.G. v. Superior Court*, *supra*, 11 Cal.5th at p. 91 ["In discerning the purposes of a proposition, 'we are guided by, but are not limited to, the general statement of purpose found in the initiative' "].)  We see little reason to uphold section 7465(c)(4) by using the fig leaf of construing it as precatory, when such a construction would render it just as ineffectual as declaring it facially invalid.

In sum, we conclude that sections 7465(c)(3) and (4) are facially invalid on separation of powers grounds because they intrude on the judiciary's authority to determine what constitutes an amendment to Proposition 22, and section 7465(c)(4) fails for the additional reason that it intrudes on the Legislature's authority by artificially expanding Proposition 22's article II, section 10(c) shadow.  As the trial court ruled and the parties agree, the proper remedy for the separation of powers violation is to sever section 7465(c)(3) and (4) and allow the rest of Proposition 22 to remain in effect, as the voters indicated they wished.  (§ 7467, subd. (a).)

## DISPOSITION

The judgment is affirmed to the extent it declared sections 7465(c)(3) and (c)(4) invalid and to the extent the trial court retained jurisdiction to consider a motion for attorney fees under Code of Civil Procedure section 1021.5. In all other respects, the judgment is reversed. The matter is remanded to the trial court with instructions to enter a new judgment not inconsistent with this opinion. All parties shall bear their own costs on appeal.

BROWN, Acting P. J.

WE CONCUR:

STREETER, J.
POLLAK, J.*

---

* Retired Presiding Justice of the Court of Appeal, First Appellate District, Division Four, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

STREETER, J., Concurring and Dissenting.

## I.    Introduction

I concur in Justice Brown's opinion except for one key aspect of part II of her discussion for the majority addressing article XIV, section 4 of the California Constitution, which vests the Legislature with "plenary power, unlimited by any provision of this Constitution, to create, and enforce a complete system of workers' compensation, by appropriate legislation . . . ."[1]  My disagreement on this point leads me to a different overall result. I would affirm the judgment, but I prefer to go further.  I believe we must invalidate Proposition 22[2] in its entirety.

All legislative power—whether exercised by the Legislature, or by the voters acting as "electors" when they enact an initiative statute—must abide by constitutional limits, federal and state.  (*In re Marriage Cases* (2008) 43 Cal.4th 757, 851.) In addition to the article III, section 3 separation of powers problem identified by Justice Brown based on what she terms the "shadow" effect of the initiative (tying the hands of the Legislature in the distinct and unrelated area of collective bargaining representation), Proposition 22 violates the California Constitution on three other grounds as well.

---

[1] All further undesignated citations to constitutional articles and sections thereof are to the California Constitution.

[2] Business & Professions Code, sections 7448–7467, as added by Proposition 22, approved by the voters, General Election (Nov. 3, 2020).

*First*, by undermining the "complete system of workers' compensation" that the people have expressly defined in article XIV, section 4, Proposition 22 constitutes a sub rosa attempt to amend the Constitution in the guise of statutory change. *Second*, article XIV, section 4, delegates to the Legislature—not the voter electors—specific lawmaking power to "create" and "enforce" a "complete system of workers' compensation." This case presents a direct conflict between the voter electors' power to adopt initiative statutes and the Legislature's power under article XIV, section 4, and on this record we must resolve that conflict in favor of the Legislature. So long as the Legislature has acted within the scope of its authority under article XIV, section 4, voter electors may not countermand a prior determination by the Legislature about what the Constitution requires. *Third*, Proposition 22 usurps a "core" or "essential" governmental function provided for in article XIV, section 4—judicial power—in violation of article III, section 3.

## II. Proposition 22 Violates Article XIV, Section 4, in Two Respects

Unlike the petitioners in *Independent Energy Producers Assn. v. McPherson* (2006) 38 Cal.4th 1020 (*McPherson*), respondents do not argue that a specific constitutional grant of lawmaking authority to the Legislature categorically precludes any use of the initiative power to legislate on the subject addressed by that grant. Their complaint is different. They say Proposition 22 so fundamentally undermines the workers' compensation system the Legislature created prior to 1918 that it

2

transgresses article XIV, section 4, and thus could only have been adopted validly by ballot amendment to the Constitution.

I believe the argument is well taken.

Proposition 22 removes app-based drivers from the constitutionally mandated workers' compensation system and substitutes a private accident insurance mandate. (Bus. & Prof. Code, §§ 7451, 7455, subd. (a).) The linchpin of Proposition 22 is the "independent contractor" definition in Business & Professions Code section 7451. Proposition 22 reversed the Legislature's judgment on this issue[3] by redefining the scope of "employment," a term that is used in the language of article XIV, section 4. No one disputes that the effect of the "independent contractor" definition in Proposition 22 is to expel app-based drivers, as a class, from the "complete system of workers' compensation" established by the Legislature more than a century ago. Because the basic architecture of that system was literally written into the Constitution in 1918, statutory changes to it must be closely scrutinized for compatibility with article XIV, section 4.

Proposition 22 cannot withstand that scrutiny in two respects, the first detailed in parts II.A.–II.B. and the second in parts II.C.–II.D.

---

[3] See Assembly Bill No. 5 (2019–2020 Reg. Sess.) (Assembly Bill 5); former Labor Code § 2750.3, as added by Stats. 2019, ch. 296, § 2; repealed and transferred to Lab. Code, §§ 2775, 2785.

**A.** ***Certain "Basic Features" of the "Complete System of Workers' Compensation" Mandated by Article XIV, Section 4, Cannot Be Revised by Statute***

Article XIV, section 4, by its express terms, defines in detail what must be in a "complete system of workers' compensation," and the new privatized scheme for app-based drivers falls far short. There are no safety and health provisions; no provisions for vocational training if a driver cannot return to work; no compensation provisions for permanent disability; and no provisions for an administrative body exercising judicial power to resolve disputes expeditiously, with direct review in the Court of Appeal. At best, app-based drivers are left with a breach of contract remedy for any deprivation of workplace accident benefits, and the value of even that is dubious since these workers (like so many these days) must sign form contracts that force them into arbitration, without access to judicial review.

Proposition 22 also permanently withdraws the Legislature's authority to address these deficiencies by restoring article XIV, section 4's protections to this class of workers. It allows no legislative amendments unless passed by seven-eighths vote of both houses of the Legislature, and even then any amendment must be "consistent with, and further[] the purpose of [Proposition 22]." (Bus. & Prof. Code, § 7465, subd. (a).) It also provides that "[a]ny statute that amends Section 7451"—the provision that removes app-based drivers from the workers' compensation system (as well as from other worker protections)— "does not further the purposes of" Proposition 22. (Bus. & Prof.

4

Code, § 7465, subd. (c)(2).)  As a result, Proposition 22 not only adopts an incomplete system of workers' compensation that fails to meet article XIV, section 4's constitutional requirements, it prevents the Legislature from acting to rectify the situation.

The Constitution, plainly read, prohibits all of this.  It is well established that article XIV, section 4, places substantive limits on *any* exercise of legislative power, whether exercised by initiative statute or by enactment of the Legislature.  The definition of "complete system of workers' compensation" in article XIV, section 4, tracks the statutory workers' compensation system that existed in 1918.  As early as 1922, the Supreme Court made clear that the Legislature has no power to go beyond the pre-1918 scheme and create new elements of a "complete system of workmen's compensation" not mentioned in the constitutional language.  (*Yosemite L. Co. v. Industrial Acc. Com.* (1922) 187 Cal. 774, 780 (*Yosemite Lumber*) [construing former article XX, section 21, adopted in November 1918, later renumbered article XIV, section 4].)[4]  That foundational

_____

[4] Former article XX, section 21 was repealed and readopted as article XIV, section 4, without substantive change in 1976. (*City of Los Angeles v. Workers' Comp. Appeals Bd.* (2009) 179 Cal.App.4th 134, 142, fn. 3; see *Six Flags, Inc. v. Workers' Comp. Appeals Bd.* (2006) 145 Cal.App.4th 91, 95 (*Six Flags*) ["The constitutional enabling provision establishing the workers' compensation scheme has remained the same since 1918 with two exceptions:  (1) a 1972 amendment adding the State of California as a beneficiary entitled to workers' compensation benefits in some cases; and (2) a 1974 amendment making the provision gender neutral, changing 'workmen' to 'workers.' "].)

5

limitation precludes any legislative attempt to revise the basic outline of the constitutionally mandated scheme for compensating workers injured or killed while engaged in "employment."[5]

*Yosemite Lumber* and other early cases applying this principle to what is now article XIV, section 4, have continuing force today. In the 1970's and 1980's the Supreme Court confirmed that, while legislation consistent with the constitutionally mandated pre-1918 statutory scheme is permissible, statutory revisions altering the "basic features" of the scheme are not. (*Mathews v. Workmen's Comp. Appeals Bd.* (1972) 6 Cal.3d 719, 734–735 (*Mathews*) [statute conditioning the right to compensation on the absence of willful misconduct held to be valid because it was consistent with "basic features" of the pre-1918 statutory scheme]; see *Hustedt v. Workers' Comp.*

---

[5] *Pacific G. & E. Co. v. Industrial Acc. Com.* (1919) 180 Cal. 497, 500 (*PG&E*) ("the terms 'employers,' 'employees' and 'employment' as used in [former] section 21, article XX, of the constitution, as amended in October, 1911, must be construed in the light of their meaning at the time of the adoption of the amendment, and cannot be extended by legislative definition, for such extension would, in effect, be an amendment of the constitution, if accepted as authoritative"); *Employers' Liability Assur. Corp. v. Industrial Acc. Com.* (1918) 179 Cal. 432, 437 [same]. In parts II.B. and II.D.2.–II.D.3. below, I explain the history of article XIV, section 4, as it evolved from its original form in 1911. Though some of the terminology changed in the course of its evolution, the scheme was always founded on the existence of an "employment" relationship. Each iteration of the constitutional language, in 1911 and in 1918, uses the term "employment" to designate the boundary of who is covered and who is not.

*Appeals Bd.* (1981) 30 Cal.3d 329, 341–346 & fn. 11 (*Hustedt*) [statute conferring power on Workers' Compensation Appeals Board to discipline attorneys invalid because it was not a "basic feature" of the pre-1918 statutory scheme].)

Of course, " '[a] statute cannot trump the Constitution.' " (*City of San Diego v. Shapiro* (2014) 228 Cal.App.4th 756, 788.) "[O]ur state Constitution is the highest expression of the will of the people acting in their sovereign capacity as to matters of state law.  When the Constitution speaks plainly on a particular matter, it must be given effect as the paramount law of the state." (*Playboy Enterprises, Inc. v. Superior Court* (1984) 154 Cal.App.3d 14, 28, citing *Ex Parte Braun* (1903) 141 Cal. 204, 211; *People v. Parks* (1881) 58 Cal. 624, 635; *Dye v. Council of the City of Compton* (1947) 80 Cal.App.2d 486, 490; *McMillan v. Siemon* (1940) 36 Cal.App.2d 721, 725.)  Thus, voter electors legislating by initiative, and the Legislature enacting statutes, can only act within the powers afforded to them by the people in article XIV, section 4.[6]

---

[6] To be sure, voter electors can always change the "basic features" of the pre-1918 system of workers' compensation by ballot constitutional amendment.  For example, former article XX, section 21, the precursor to article XIV, section 4, authorized the Legislature to create a system "to compensate . . . workers for injury or disability, and their dependents for death incurred or sustained by the said workers."  (Prop. 23, approved by the voters, Gen. Elec. (Nov. 5, 1918); Ballot Pamp. text of Prop. 23 at <https://repository.uchastings.edu/cgi/viewcontent.cgi?article=1127&context=ca_ballot_props> [as of Mar. 13, 2023].)  The California Supreme Court held in 1922 that these words did not

What this means here, as a practical matter, is that there is a minimum constitutional baseline to our workers' compensation system no statute can go below. If, after adoption of article XIV, section 4—which codified in the Constitution itself what a "complete system of workers' compensation" meant prior to 1918—the Legislature had attempted to create a different statutory scheme by lopping off some of the "basic features" of that system (*Mathews*, *supra*, 6 Cal.3d at p. 735), the statute would have been invalid. Nothing could be more "basic" to the system of workers' compensation than the scope of the "employment" relationship. Because Proposition 22 attempts to redefine that term in a manner that is contrary to the laws of workplace accident protection as "those laws . . . have existed since 1911" (*Mathews*, at p. 735), I believe it is unconstitutional.

B. *Article XIV, Section 4, Has Continuing Vitality Today*

Insisting upon a narrow reading that gives article XIV, section 4, no contemporary substance at all, the Attorney General and the interveners (collectively, the Proposition 22 proponents)

---

authorize payment of compensation benefits to a state fund if the worker died without dependents (*Yosemite Lumber*, *supra*, 187 Cal. at p. 782), a holding that was later extended to invalidate awards to the estates of deceased workers (see *Commercial Cas. Ins. Co. v. Industrial Acc. Com.* (1930) 211 Cal. 210, 215). Many years later, the voters amended article XIV, section 4, to allow the Legislature to authorize payment of a compensation award for a worker who dies without dependents either to the state (Prop. 13, approved by the voters, Gen. Elec. (Nov. 7, 1972); see *Six Flags*, *supra*, 145 Cal.App.4th at p. 97), or to the worker's estate (Prop. 14, approved by the voters, Prim. Elec. (June 8, 1976)).

8

cite *Mathews* for the idea that the only purpose of article XIV, section 4, was to provide constitutional armor against judicial invalidation by *Lochner* era courts.[7]  While there is a grain of truth to this line of argument, the Proposition 22 proponents take the idea too far.  Our Supreme Court has indeed recognized that the "sole purpose" of article XIV, section 4, was to put to rest "all doubts" about the constitutionality of the existing statutory workers' compensation scheme in 1918.  (*Mathews*, *supra*, 6 Cal.3d at p. 734; *City and County of San Francisco v. Workers' Comp. Appeals Bd.* (1978) 22 Cal.3d 103, 114.)  But the *Mathews* court said nothing about *Lochner* or *Lochnerism*, and understandably so, because there is considerably more to the origin story of article XIV, section 4, than that.

For proper perspective, some historical background is necessary.  By 1918, our Legislature had passed three versions of a statutory workers' compensation scheme, each building on the last one in sequence.  These schemes—which were viewed as "radical," even "revolutionary," at the time (*Western Indemnity Co. v. Pillsbury* (1915) 170 Cal. 686, 692 (*Western Indemnity I*))— eliminated employers' common law tort defenses against employee workplace accident claims and created an administrative system for adjudicating and enforcing such claims on a no-fault liability basis.  The first, passed in 1911 and known as the Roseville Act (Stats. 1911, ch. 399, §§ 1–31, pp. 796–806),

---

[7] See *Lochner v. New York* (1905) 198 U.S. 45, disapproved, *West Coast Hotel Co. v. Parrish* (1937) 300 U.S. 379.

was purely voluntary; the second, passed in 1913 and known as the Boynton Act (Stats. 1913, ch. 176, §§ 1–92, pp. 279–320), was compulsory. Refinements were made in the "workmen's compensation, insurance and safety act of 1917" (Stats. 1917, ch. 586, §§ 1–74, pp. 831–879 (the 1917 Act)), which partially repealed and restated the Boynton Act (1917 Act, at pp. 831–832).[8] This series of enactments reflected the cumulative statutory evolution of the pre-1918 workers' compensation system. These statutes are what the *Mathews* court refers to when it speaks of the "basic features of those laws as they have existed since 1911." (*Mathews*, *supra*, 6 Cal. 3d at p. 735.)[9]

Article XIV, section 4, evolved along a parallel path, also in two steps. First, by ballot initiative in 1911—in fact, at the same special election that brought us the powers of initiative,

---

[8] The current workers' compensation statutory scheme appears in the Labor Code. (*King v. CompPartners, Inc.* (2018) 5 Cal.5th 1039, 1046 ["First created more than a century ago, California's workers' compensation system is now governed by the Workers' Compensation Act (WCA; Lab. Code, § 3200 et seq.), 'a comprehensive statutory scheme governing compensation given to California employees for injuries incurred in the course and scope of their employment.' "].)

[9] The majority opinion appears to question whether the *Mathews* and *Hustedt* courts actually meant what they said in stating that the language of article XIV, section 4, codified the "basic features" of the pre-1918 statutory scheme. (Maj. opn., *ante*, at p. 22, fn. 10.) But the constitutional language—which these courts were simply describing when they said article XIV, section 4, outlines the "basic features" of a "complete system of workers' compensation" (*Hustedt*, *supra*, 30 Cal.3d at pp. 342–343, fns. 10 & 11)—speaks for itself.

referendum and recall—the voters laid a constitutional foundation for the Roseville Act by adding former article XX, section 21, to the Constitution. Framed in abbreviated language compared to what later became article XIV, section 4, as we now know it, that amendment gave the Legislature plenary power to create and enforce a system of liability without fault for workers injured in the workplace. Second, seven years later, in November 1918, the Legislature by joint resolution proposed the adoption of an amendment to the 1911 version of former article XX, section 21 (*Mathews*, *supra*, 6 Cal.3d at p. 733), this time adding much greater specificity and detail. The 1918 amendment augmenting former article XX, section 21, is in all material respects what we now have in article XIV, section 4.

The amended language adopted in 1918 delineates with particularity the Legislature's authority to make "adequate provisions" for relieving workers and their families of the "consequences of any injury or death incurred or sustained by workmen in the course of their employment, irrespective of the fault of any party"; "full provision for securing safety in places of employment"; "full provision for such medical, surgical, hospital and other remedial treatment as is requisite to cure and relieve from the effects of such injury"; "full provision for adequate insurance coverage against liability to pay or furnish compensation"; "full provision for otherwise securing the payment of compensation"; and "full provision for vesting power, authority and jurisdiction in an administrative body with all the requisite governmental functions to determine any dispute or matter

11

arising under such legislation, . . ."  (Former art. XX, § 21, amended by Prop. 23, Gen. Election (Nov. 5, 1918).)

Of particular significance here—because this reflects the superior position article XIV, section 4, enjoys relative to other provisions within the Constitution, as well as the preeminent role the Legislature has in making "social public policy" pertaining to workers' compensation vis-à-vis other governmental actors—the amended language makes clear for the first time that (1) the Legislature's "plenary" power to do all of the above-listed things is "unlimited by any provision of this constitution" and (2) the "social public policy" reflected in the system of workers' compensation established by the Legislature pursuant to this authority is "binding upon all departments of the state government."  (Former art. XX, § 21, amended by Prop. 23, Gen. Election (Nov. 5, 1918).)

Stepping back for a moment to understand why a second ballot amendment was necessary in 1918, we must look to case law developments.  In 1915, our Supreme Court upheld the Boynton Act against constitutional attack in *Western Indemnity I* over a vigorous dissent by Justice Henshaw, who predicted that "the decision in this case will doubtless pass under the scrutiny of the supreme court of the United States" (*Western Indemnity I*, *supra*, 170 Cal. at p. 721 (dis. opn. of Henshaw, J.)).  The Henshaw dissent in *Western Indemnity I* was wide-ranging. It attacked the Boynton Act as an unreasonable exercise of the police power—a classic *Lochner*-style substantive due process

12

argument[10]—but it raised equal protection and takings clause issues as well.[11]  A concurring opinion by Justice Shaw took the position that the no fault liability provisions of the Boynton Act were sustainable under the taxing power, but agreed that, in a case where an employee's injury was brought about by his own negligence, the application of the Boynton Act would constitute "an attempt to take private property from the owner for the private use of another person . . . without lawful excuse or right and without compensation."  (*Western Indemnity I*, *supra*, at p. 735 (conc. opn. dubitante of Shaw, J., on rehg. den.)

Perhaps most importantly, the concurrence and the dissent in *Western Indemnity I* together cast doubt on whether former article XX, section 21, provided adequate support for the Boynton Act as a matter of state law.[12]  Justice Henshaw, who saw the Boynton Act as an exercise in "socialistic paternalism" (*Western*

---

[10] *Western Indemnity I*, *supra,* 170 Cal. at pages 711–716; see *Ives v. South Buffalo Ry. Co.* (1911) 201 N.Y. 271 citing and relying on *Lochner v. New York*, *supra*, 198 U.S. 45, disapproved, *West Coast Hotel Co. v. Parrish*, *supra*, 300 U.S. 379, to invalidate New York's workers' compensation statute.

[11] *Western Indemnity I*, *supra*, 170 Cal. at page 716 (the statute is "obnoxious to the constitutional provisions guaranteeing equal protection . . . and forbidding confiscation").

[12] *Western Indemnity I*, *supra*, 170 Cal. at page 729 (dis. opn. of Henshaw, J.) (Boynton Act exceeds the Legislature's powers under former article XX, section 21, as adopted in 1911); cf. *Western Indemnity I*, at page 735 (conc. opn. dubitante of Shaw, J., on rehg. den.) (combination of taxing power and police power insufficient to save Boynton Act from constitutional invalidity where employee fault implicated in his own injury).

*Indemnity I*, *supra*, 170 Cal. at p. 724), articulated this view most forcefully. His dissent hammered away at the theme that the basis for the Boynton Act was not an exercise of the police power at all, but instead was an unbridled expression of sovereign "fiat" (*Western Indemnity I*, at p. 710 (dis. opn. of Henshaw, J.)) that "places upon the employer, to the peril of his welfare and the loss of all his property, the performance of a duty resting upon the state itself." (*Id.* at p. 723.) According to Justice Henshaw, the "[l]egislature mistakenly put on this constitutional grant" a vast and oppressive power that went well beyond its "declared limits." (*Id.* at p. 729.)

This backdrop in the California Supreme Court is important here, but just as relevant are developments prior to 1918 in the United States Supreme Court. While concerns about potential constitutional invalidation as a matter of substantive due process under the United States Constitution were real in 1915, as Justice Henshaw's dissent demonstrates, those concerns had largely evaporated by 1918. The prediction of a grant of certiorari in *Western Indemnity I* did not come true, and in a trio of cases decided in the high court's 1917 term, that court addressed—and rejected—*Lochner* challenges to statutory workers' compensation systems of different kinds. (See *Mountain Timber Co. v. State of Washington* (1917) 243 U.S. 219 [voluntary scheme]; *Hawkins v. Bleakly* (1917) 243 U.S. 210 [voluntary scheme]; *New York Cent. R. Co. v. White* (1917) 243 U.S. 188

14

[compulsory scheme].) *White*, in particular, was a turning point, since it dealt with a compulsory scheme similar to California's.[13]

At both the federal and state level, what this brief review of the pertinent case law shows is that, by the time the proposed amendment to revise former article XX, section 21, came on the ballot in November 1918, it was not *Lochner* that cast constitutional doubt on California's statutory workers' compensation scheme. Rather, the source of doubt was the split of opinion in *Western Indemnity I* over the adequacy of former article XX, section 21, as a state constitutional foundation for California's workers' compensation scheme. Given the state of the law at the time, the 1918 amendment sought to bolster and enhance the language of former article XX, section 21, as originally adopted in 1911, in direct response to the Henshaw view that that grant of lawmaking power was limitless and unbounded. The objective was to anchor article XIV, section 4,

_____

[13] Following the decisions in these cases, in June of 1919 the high court brushed aside another attempt to challenge a state workers' compensation statute on substantive due process grounds with the following words: "In view of our recent decisions sustaining state laws imposing upon employers in the hazardous industries responsibility in one form or another for the consequences of injuries received by employees in the course of the employment in the absence of fault on the employer's part . . . , little need now be said." (*New York Cent. R. Co. v. Bianc* (1919) 250 U.S. 596, 601 [citing *New York Cent. R. Co. v. White, supra*, 243 U.S. 188 and *Mountain Timber Co. v. State of Washington, supra,* 243 U.S. 219, among other cases].)

15

more strongly in our Constitution, independently of the police power.[14]

Accordingly, while it is true that the purpose of the 1918 amendment was to "remove all doubts as to the constitutionality of then existing workmen's compensation laws" (*Mathews*, *supra*, 6 Cal.3d at p. 733)—a remark which must be understood against the backdrop of what the *remaining* doubts were when voters went to the polls—it is an overstatement to go a step further and suggest that the demise of *Lochnerism* in the mid-1930's transformed article XIV, section 4, into a constitutional dead letter. In service of an argument that article XIV, section 4, may safely be ignored today, that account of what happened places a convenient expiration date on this provision of the Constitution. But it is incomplete and misleading as history.

For proof, we need look no further than the cases construing article XIV, section 4, to put substantive limitations

_____

[14] In the modern terminology of United States Supreme Court jurisdiction, this would be called an effort to insulate the decision in *Western Indemnity I* against federal constitutional attack—on *any* ground—by ensuring that the vehicle for such a future challenge would be a California decision resting on "adequate and independent state grounds." (E.g., *Republican Nat. Committee v. Burton* (1982) 455 U.S. 1301, 1302.) As a recipe to ward off federal review, this is not a theory I am reading into the case law based on hindsight. It is a strategy that actually played out in a case involving Arizona's workers' compensation scheme, where, just as we see with article XIV, section 4, the challenged statute was based on a specific grant of lawmaking power in that state's constitution. (See *Arizona Employers' Liability Cases* (1919) 250 U.S. 400, 417–419.)

16

on legislative power, dating from as early as 1922 (*Yosemite Lumber, supra*, 187 Cal. 774) to as recently as 1981 (*Hustedt, supra*, 30 Cal.3d 329) and even more recently, 2006 (*Six Flags, supra*, 145 Cal.App.4th 91), long after *Lochner* was gone. If we take stock of the full history, article XIV, section 4, remains as vital today as it was when adopted in 1918. It should be treated with the seriousness and dignity it deserves as one of several enduring constitutional achievements of the progressive reform era, along with and adjacent to the powers of direct democracy. Here, what that means is we must stand ready to strike down any statute that exceeds the outer limits of legislative power established by article XIV, section 4. I believe Proposition 22 crosses that line.

**C. *This Case Presents the Conflict of Legislative Powers Issue Anticipated in Footnote 9 of the Supreme Court's Opinion in* Independent Energy Producers Assn. v. McPherson**

   1. *The Conflict Here Is Between Concurrent Powers, Not Coextensive Powers*

Although the most glaring constitutional violation presented here is the use of a ballot initiative to effect what amounts to an amendment of the Constitution, a second, related article XIV, section 4, violation requires the invalidation of Proposition 22.

By placing the eligibility of app-based drivers for workers' compensation benefits off-limits to amendment by the Legislature, Proposition 22 seeks to override constitutional responsibility delegated to the Legislature. The Proposition 22

17

proponents contend that, in striking the initiative down on that basis, the trial court erred by construing the term "plenary" as "exclusive." This is not an accurate characterization of the trial court's ruling. The trial court saw a conflict between article XIV, section 4, and article II, section 10(c), and resolved it in favor of the Legislature. I believe it was correct to do so.

The deficiency I see here is structural. The delegated power we are dealing with—the power to carry out a specific constitutional task (i.e., to establish and maintain a "complete system of workers' compensation")—was conferred on "the Legislature" under article XIV, section 4, not on the voters acting as "electors." Because voter "electors" and the "Legislature" share the police power, they may each legislate on the subject of workers' compensation, which is why our Supreme Court has held that the article II, section 8(a) power to adopt initiative statutes is "encompass[ed]" within the Legislature's article XIV, section 4 power. (*McPherson, supra,* 38 Cal.4th at p. 1025.)

But as the trial court correctly concluded, when voter electors exercise the police power in a way that comes into conflict with the Legislature's article XIV, section 4, power, we have the dilemma the Supreme Court flagged in footnote 9 of its *McPherson* opinion. (*McPherson, supra*, 38 Cal.4th at p. 1044, fn. 9.) In that footnote, the court carefully left open issues that may be raised in a scenario where an initiative statute "improperly conflicts with the Legislature's exercise of *its* authority" under a specific delegation of legislative power in the Constitution. (*McPherson*, at p. 1044, fn. 9., original italics.)

18

Emphasizing that we must liberally construe the people's "initiative power" (*Legislature v. Eu* (1991) 54 Cal.3d 492, 501) and "resolve any reasonable doubts in favor" of this right (*Brosnahan v. Brown* (1982) 32 Cal.3d 236, 241, italics omitted), the Proposition 22 proponents tell us there is no genuine conflict here because the legislative power of the voters is at least coextensive with and in some respects "greater than that of the Legislature" (*Rossi v. Brown* (1995) 9 Cal.4th 688, 704).  But because we are dealing with a ballot statute that treads on a constitutionally delegated power assigned specifically to the Legislature, sweeping statements about the people's "precious rights" of initiative (*Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization* (1978) 22 Cal.3d 208, 248) provide little guidance.

Precision is crucial.  Voter electors are not the "people" when they legislate under article II, section 8(a).  They exercise sovereign power as the "people" only when they approve ballot constitutional amendments.  Although voter electors and the Legislature may both exercise the police power to pass legislation, and ordinarily the electors have the upper hand when both wish to legislate on the same subject (art. II, § 10(c); *People v. Kelly* (2010) 47 Cal.4th 1008), this is not an ordinary case.  The power exercised by voter electors under article II, section 8(a), and the power exercised by the Legislature under article XIV, section 4, overlap, but these two powers remain distinct, as the history of article XIV, section 4, recounted above shows.  Nothing in *McPherson* holds to the contrary.  The *McPherson* court

19

pointed out that the electors' ability to adopt statutes by initiative is a "similar power" to that of the Legislature under article XII, section 5 (*McPherson, supra*, 38 Cal.4th at p. 1033), not that the electors *are* "the Legislature" when they legislate on workers' compensation matters, having simply stepped into the shoes of the Legislature, clothed with article XII, section 5, authority.

Because only the Legislature has the constitutional power to act "pursuant to" article XIV, section 4 (*Graczyk v. Workers' Comp. Appeals Bd.* (1986) 184 Cal.App.3d 997, 1008), I believe the most accurate way to describe these two powers when they conflict is that they are *concurrent*, not that they are coextensive. (See *Youngstown Sheet & Tube Co. v. Sawyer* (1952) 343 U.S. 579, 637–638 (*Youngstown Sheet & Tube*) (conc. opn. of Jackson, J.).) The friction generated by a direct clash of two concurrent legislative powers within our basic plan of government presents a rare and difficult constitutional question. One of these two sources of power must give way when they collide, and as I read it, footnote 9 of *McPherson* signals that the usual rules of deference to legislation adopted by ballot initiative may have to yield in the face of competing constitutional considerations. In my view, this is such a case.

2. McPherson *Provides the Backdrop*

Before delving further into the conflict of concurrent powers issue before us, some background discussion of *McPherson* is useful. At issue there was an initiative statute,

20

Proposition 80, that expanded the regulatory jurisdiction of the Public Utilities Commission (PUC). Article XII, section 5, gives the Legislature "plenary power" to confer "additional regulatory authority and jurisdiction" upon the PUC, and the question was whether that clause prevents the voters from expanding the PUC's regulatory jurisdiction by statutory ballot initiative. (*McPherson*, *supra*, 38 Cal.4th at p. 1023.) The Court of Appeal said yes, holding that legislation by ballot initiative was preempted on all subject matter covered by article XII, section 5. (*McPherson*, at p. 1023.)

The Supreme Court reversed. After canvassing its precedents, the court concluded, first, "long-standing California decisions establish[] that references in the California Constitution to the authority of the Legislature to enact specified legislation generally are interpreted to include the people's reserved right to legislate through the initiative power" (*McPherson, supra*, 38 Cal.4th at p. 1043); and second, "in light of the background and purpose of the relevant language of article XII, section 5, . . . [the clause] does not preclude the people, through their exercise of the initiative process, from conferring additional powers or authority upon the PUC" (*id*. at pp. 1043–1044).

The second step of the analysis in *McPherson*, laying out the historical backdrop to article XII, section 5, was key. At the time it was added to the Constitution in 1911, there was great concern that railroad companies exercised de facto control over many organs of state government, including the Railroad

21

Commission, the precursor to the PUC. (*McPherson*, *supra*, 38 Cal.4th at pp. 1038–1039.) By controlling the membership of the Railroad Commission, the railroads managed to evade regulation of their rates. (*Ibid.*) The motivating purpose of the ballot initiative that became article XII, section 5, was to take membership control of the Railroad Commission away from the railroads and ensure that, going forward, the Railroad Commission had adequate regulatory authority to control railroad rates. (*McPherson*, at p. 1040.) The clause in article XII, section 5 conferring "plenary power" on the Legislature to grant "additional authority and jurisdiction" addressed the potential that, to ensure the Railroad Commission's continued regulatory effectiveness, expanded regulatory authority might be needed in the future.

When *McPherson* was decided in 2006, the regulatory target was different, but the overall purpose of article XII, section 5, was the same. Independent electric service providers (ESP's) were then an important new source of electric power to the public grid, and utilities' cost of power purchases from them was increasingly affecting rates to consumers. (*McPherson*, *supra*, 38 Cal.4th at pp. 1025–1027.) But ESP's emerged in the 1990's as creatures of the energy deregulation movement and were unregulated, so the PUC had no rate-setting or enforcement control over them. (*Ibid*.) To fill the gap, Proposition 80 extended the agency's rate-setting and enforcement authority to ESP's. (*McPherson*, at pp. 1025–1027.)

The Supreme Court concluded that this new grant of regulatory authority was consistent with the "origin and purpose" of article XII, section 5 (*McPherson*, *supra*, 38 Cal.4th at p. 1025): To ensure the continuing effectiveness of the Railroad Commission, and hence of its regulatory successor, the PUC. *McPherson* would have been a very different case—the type of case we have here—had Proposition 80, for example, *removed* the PUC's statutory jurisdiction to regulate investor-owned utilities rather than added to it. That is why respondents invoke footnote 9 of the *McPherson* opinion. They argue that, while ballot statutes may be used to build upon and refine our constitutionally sanctioned "complete system of workers' compensation," the power to legislate by initiative may not be used to undermine that system.

The interveners deride respondents' reading of *McPherson* as an attempt to create a "one-way ratchet" permitting additive revisions to our statutory workers' compensation system, but not subtractions from it. What the interveners overlook, in my view, is that, structurally, our state Constitution supports respondents' reading much better than it does theirs. They are asking that we allow the voter electors to "undo" what the Legislature has done pursuant to its article XIV, section 4 powers, and at the same time bar the Legislature from restoring what the electors have taken away, even if a majority of the Legislature reads the Constitution to require it.

We are not dealing simply with who gets the legislative last word. Because the issue of whether an app-based driver is an

employee or an independent contractor determines threshold eligibility for workers' compensation, it is squarely within the heartland of lawmaking power conferred solely upon the Legislature in article XIV, section 4. By seeking to reserve all statutory lawmaking power for themselves on this issue, the Proposition 22 voter electors go well beyond a measure in which voter electors have told the Legislature not to tinker with their statute. This statutory initiative attempts to seize and permanently redistribute constitutional power in a manner that subverts article XIV, section 4, itself.

Let me be concrete about the problem I see here. If, mindful of the robust support for the Proposition 22 in the November 2020 election, a majority of elected legislators understand it to be their solemn constitutional obligation under article XIV, section 4, to override the definition of "independent contractor" adopted by voter electors—none of whom took any oath to uphold the Constitution when they entered the voting booth—I believe these legislators should be free to do so, unimpeded by Proposition 22. Indeed, I believe that article XIV, section 4, entitles them to have the last word on that issue, since the definition of "independent contractor" in Proposition 22 "would, in effect, be an amendment of the Constitution, if accepted as authoritative." (*PG&E*, *supra*, 180 Cal. at p. 500.)

For that reason alone, we must resolve the conflict of concurrent powers issue presented in this case in favor of the Legislature. And in doing so, we need not handle this conflict as a zero-sum showdown in which one of the two must nullify the

24

other.  All we need do to resolve this case is recognize that we are in a "zone of twilight" (*Youngstown Sheet & Tube*, *supra*, 343 U.S. at p. 637 (conc. opn. of Jackson, J.) where both powers are operative, while resolving the conflict on this particular record based on a tie-breaking principle drawn from article XIV, section 4.  In practical terms, what that means is simply this: When the electors choose to legislate on the topic of workers' compensation by ballot, they must do so in a manner that is consistent with any prior exercise of article XIV, section 4, power by the Legislature.

Proposition 22 fails that test.  The Legislature used its article XIV, section 4 power in passing Assembly Bill 5, which was enacted in 2019 to clarify that app-based drivers and couriers are included within the existing workers' compensation and occupational health and safety systems.  Because the Legislature had acted previously on this topic pursuant to article XIV, section 4, when Proposition 22 came to the ballot, and acted decisively, I believe the voter electors were required to respect what the Legislature had done and lacked power to countermand it.  To borrow Justice Jackson's famous phrasing, Proposition 22 having been adopted in the face of the "expressed will" of the Legislature, the voters' power to legislate by initiative on the same topic was at its "lowest ebb" in those circumstances (*Youngstown Sheet & Tube*, *supra*, 343 U.S. at p. 637), and must be deemed subordinate.

Courts have recognized a number of implied limitations on the initiative powers.  Although article XVIII, section 3, of the

25

Constitution expressly declares that it can be amended by initiative, the initiative cannot be used to revise the Constitution. For example, the power of statutory initiative cannot be used to order the Legislature to pass a resolution because article II, section 8(a) speaks only of the "adoption or rejection of 'statutes.' " (*American Federation of Labor v. Eu* (1984) 36 Cal.3d 687, 708.) Nor can the power of statutory initiative be used to regulate the Legislature's internal operations, because that would conflict with the express grant of power in article IV, section 7(a) authorizing the Legislature to run its own affairs. (*People's Advocate, Inc. v. Superior Court* (1986) 181 Cal.App.3d 316, 327.) To this list, I believe we must add that the power of statutory initiative cannot be used to subvert an express constitutional power delegated to the Legislature, and to the Legislature alone. (*Ibid.* ["Only by means of an initiative constitutional amendment may the people modify or impinge upon the freedom of the Legislature to exercise its constitutionally granted powers."].)

**D. *Applying "The Relevant Constitutional Provision" (Article XIV, Section 4) to the Terms of the Statute Involved (Proposition 22)***

Although Justice Jackson's *Youngstown Sheet & Tube* concurrent powers framework provides important analytical guidance for resolving the conflict of legislative powers problem before us—and answers the question presented here simply and easily when applied in light of cases recognizing certain implied limits on the initiative power—the specific mode of analysis must

26

come from *McPherson*, since in that case our Supreme Court laid the groundwork for us in a case that is unquestionably the closest analog to our own. Footnote 9 of the *McPherson* opinion states that, should a conflict of the kind it contemplates arise in some future case, the analysis will be governed by the "application of the relevant constitutional provision or provisions to the terms of the specific legislation at issue." (*McPherson, supra,* 38 Cal.4th at p. 1044, fn. 9.)

As I noted above, the independent contractor definition in Business & Professions Code section 7451 is the "specific legislation" at issue here. This provision overturns the Legislature's judgment in Assembly Bill 5 that app-based drivers must be treated as employees until putative employers prove otherwise in case-by-case adjudication within the workers' compensation system. Because class-wide exclusion of app-based drivers from the workers' compensation system is the main objective of Proposition 22—in direct conflict with Assembly Bill 5—the analysis under footnote 9 of the *McPherson* opinion turns on the language of article XIV, section 4.

Settled principles of interpretation govern the inquiry. Because it is elementary that we avoid interpreting our Constitution in a manner that renders any of its provisions nugatory, inoperative or meaningless (*Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735), we must strive to give article XIV, section 4, meaning. To discern the intent of the people acting in their sovereign capacity in 1918—and not project our modern understanding in retrospect—we must apply " ' "the same

27

principles that govern statutory construction." [Citation.] Where a law is adopted by the voters, "their intent governs." [Citation.] In determining that intent, "we turn first to the language of the statute, giving the words their ordinary meaning." ' " (*People v. Raybon* (2021) 11 Cal.5th 1056, 1065.)

If it is necessary to go beyond plain meaning and consider context, historical context is relevant, as our Supreme Court recognized in addressing the parameters of a similar constitutional provision, article XII, section 5, in *McPherson*. (See *McPherson*, *supra,* 38 Cal.4th at pp. 1039–1040.) And as with statutory construction, the language in question " 'must also be construed in the context of the statute as a whole and the overall statutory scheme. [Citation.] We apply a presumption, as we similarly do with regard to the Legislature, that the voters, in adopting an initiative, did so being "aware of existing laws at the time the initiative was enacted." ' " (*People v. Raybon*, s*upra*, 11 Cal.5th at p. 1065.)

> 1. *Text: Detailed and expansive grant of power "unlimited by any provision of this Constitution" to "create" and "enforce" a "complete system of workers' compensation"*

Applying these principles to article XIV, section 4, two things are immediately apparent. First, what is most striking textually about article XIV, section 4, is its detail and specificity. There is a reason for that. When "California joined a rapidly growing number of states in adopting . . . workmen's compensation act[s]" in the early twentieth century (*Mathews*,

28

*supra*, 6 Cal.3d at p. 729),[15] our state was one of only a small group that specified "definite forms of compensation laws" in its Constitution. (Schneider, The Law of Workmen's Compensation (1922) Ch. 2, § 4, p. 10, fn. 5.)[16] The Proposition 22 proponents largely ignore the specificity of the text, dealing with it dismissively by suggesting that article XIV, section 4, is archaic (which is incorrect, as I have noted above), and is in any event redundant to the police power (which is equally incorrect, as I have also noted above).

The breadth of the constitutional language is also striking. Article XIV, section 4, grants "plenary" legislative power "*unlimited by any provision of this Constitution.*" (Art. XIV, § 4, italics added.) The Proposition 22 proponents contend a literal reading of this expansive language would lead to absurd results, for it would free the Legislature from constitutional constraints such as the gubernatorial veto. But that is a strawman

---

[15] See Fishback & Kantor, *The Adoption of Workers' Compensation in the United States, 1900–1930* (1998) 41 J. Law & Econ. 305, 319, table 2 (listing 48 states that adopted workers' compensation statutes between 1910 and 1918); *id.* at p. 319 (" 'No other kind of labor legislation gained such general acceptance in so brief a period in this country.' ").

[16] See Dinan, *Foreword: Court-Constraining Amendments and the State Constitutional Tradition* (2007) 38 Rutgers L.J. 983, 995–996 (noting that constitutional provisions "guaranteeing the constitutionality of workers' compensation programs" were adopted in New York, Ohio, Arizona, California, Vermont, Wyoming, Pennsylvania, and Texas); *id.* at p. 995 (describing these provisions as "court-preempting constitutional amendments").

argument. The breadth of the grant is easily explained by the variety of constitutional objections that had been raised prior to 1918. Due process objections were a concern, but not the only ones.

Nor is there any need to read this language as giving the Legislature wholly unchecked power, which was the contention Justice Henshaw made in *Western Indemnity I*, as echoed by the Proposition 22 proponents here with their "absurd results" argument. Respondents readily concede the Legislature must pass "appropriate legislation" under article XIV, section 4, before its views are binding on anyone. Naturally, that requires adherence to all requisite procedures under article II, section 8, subject to gubernatorial veto. Without following those procedures, no bill the Legislature passes is binding on anyone. It is not law at all, and is certainly not "appropriate legislation." Similarly, a statute that exceeds the Legislature's authority under article XIV, section 4, would not be "appropriate legislation."[17]

Second, functionally, the constitutional text charges the Legislature with the responsibility not only to "*create*" a "complete system of workers' compensation"—in effect, codifying in the Constitution itself the statutory system then in existence—

---

[17] The Proposition 22 proponents make no claim that Assembly Bill 5 exceeded the Legislature's authority under article XIV, section 4. Nor could they, since Assembly Bill 5 simply codified the Supreme Court's holding in *Dynamex Operations West, Inc. v. Superior Court* (2018) 4 Cal.5th 903 (*Dynamex*).

30

but also to "*enforce*" that system "by appropriate legislation" in the years ahead, while making clear that the pre-1918 "social public policy" reflected in the Legislature's "complete system of workers' compensation" has constitutionally binding effect on "all departments of State government." (Art. XIV, § 4, italics added.) There is nothing time-limited about any of this. Article XIV, section 4, gave the Legislature a constitutionally designated role in 1918, and that role continues today. Nowhere is there any hint or suggestion that voter electors may commandeer it by ballot statute.

Here again, the Proposition 22 proponents respond with overstatement. In their view, any suggestion the Legislature has a singular role to play under article XIV, section 4, must mean an exclusive role—preemptive of action by any other governmental actors. As framed in *McPherson*, that was indeed the issue addressed, there in the context of article XII, section 5. But not here. Respondents make no attempt to read article XIV, section 4, so broadly that it would nullify the power to adopt initiative statutes or place the Legislature's judgments beyond judicial review. Nor do I. What we are called upon to decide is whether, absent a constitutional amendment, the text of article XIV, section 4, requires "all departments of State government" to give *deference* to the Legislature's specifically delegated power to "create" and "enforce" a "complete system of workers' compensation." This is why I believe it is crucial to appreciate that we are dealing with two concurrent powers here, and that the clash between them on this record must be resolved by

31

examining whether we can discern in the text of article XIV, section 4, any preference for either of these two forms of statutory lawmaking when they are in conflict.

I think the answer is yes, we can discern such a preference, and it is for lawmaking by the Legislature. The grant of lawmaking power in article XIV, section 4, is not self-executing. While voter electors passing an initiative statute have no duty to do anything—their lawmaking power is purely discretionary—article XIV, section 4, charges the Legislature with an ongoing responsibility to carry out and abide by the terms of a constitutional mandate. "[A]rticle XIV, section 4 . . . defin[es] the necessary provisions for a complete workers' compensation system, and le[ft] it up to the Legislature to enact laws to give effect to each provision." (*Bautista v. State of California* (2011) 201 Cal.App.4th 716, 729; see *ibid.* ["only the Legislature has constitutional authority to create and enact the workers' compensation system"].) This special role is not discretionary. Under article XIV, section 4, "[t]he Legislature *must* act to fulfill its constitutional mandate to create the workers' compensation system, and the judicially enforceable rights are the laws it enacts." (*Bautista*, at p. 729, italics added.)[18] So long as the

_____

[18] My colleagues observe that there is "no logical conflict between article XIV, section 4 needing implementing legislation and the voters retaining their initiative power in the same field" and that "both can coexist." (Maj. opn., *ante*, at p. 14, fn. 7.) I have not suggested to the contrary. They seem to miss the point of my focus on the need for implementing legislation: The Legislature has a constitutional duty to act under article XIV,

Legislature acts within the boundaries of its authority under article XIV, section 4, its specially designated constitutional role demands deference.

Just as with *Youngstown Sheet & Tube*, there is a federal model to draw upon here. This model reflects a great deal of accumulated judicial wisdom applying what are perhaps the most well-known implementing clauses in American constitutional law—Congress's "power to enforce, by appropriate legislation, the provisions of" the Fourteenth and Fifteenth Amendments. (U.S. Const., XIV Amend., § 5; XV Amend., § 2.) The high court has consistently held that "Congress' judgment regarding exercise of its power to enforce the Fourteenth and Fifteenth Amendments warrants substantial deference." (*Shelby County v. Holder* (2013) 570 U.S. 529, 566 (dis. opn. of Ginsburg, J.).) It is true, of course, that Congress' powers are limited by enumerated grants, while the police power is a general power to govern by legislative prescription and needs no affirmative grant. But that makes no difference. The lesson to be drawn from these venerable grants of Congressional authority is that a constitutionally conferred *prospective enforcement power* carries with it an ongoing responsibility to apply and determine the meaning of constitutional language when faced with changing conditions. Legislative judgment in discharging that constitutional responsibility merits substantial deference.

section 4, while voters going to the polls do not. A conflict arises only if ballot electors seek to obstruct the Legislature from discharging its duty.

To protect the enforcement prerogatives given to the Legislature in article XIV, section 4, substantial deference is due here as well—and not just from courts, but also from ballot statute electors. Unless we treat ballot statute electors as somehow outside our basic plan of government, they are bound to give the Legislature deference, just as courts are. Giving the expansive constitutional text its plain meaning, I believe we should read article XIV, section 4, as a command that when the Legislature enacts "appropriate legislation" designed to implement the constitutionally mandated "complete system of workers' compensation," its judgment trumps that of unelected voter lawmakers in the face of a conflict. So understood, article XIV, section 4, does not oust voter electors of power to legislate on the topic of workers' compensation; it simply requires them to respect prior determinations of the Legislature as to what the Constitution requires.

2. *Historical context: Augmentation of the original 1911 amendment, former article XX, section 21, and significance of* Western Indemnity I *to the issue of* pro tanto *repeal*

The historical context surrounding the adoption of article XIV, section 4, supports this reading of the text. The original 1911 amendment was relatively brief. It stated, simply: "The legislature may by appropriate legislation create and enforce a liability on the part of all employers to compensate their employees for any injury incurred by the said employees in the course of their employment irrespective of the fault of either

34

party. The legislature may provide for the settlement of any disputes arising under the legislation contemplated by this section, by arbitration, or by an industrial or accident board, by the courts, or by either any or all of these agencies, anything in this constitution to the contrary notwithstanding." (Former art. XX, sec. 21, added by Prop. 10, Special Elec. (Oct. 10, 1911); Ballot Pamp. text of Prop. 10 at <https://repository.uchastings.edu/ca_ballot_props/24/> [as of Mar. 13, 2023].)

By the time the Legislature proposed an amendment to former article XX, section 21, in 1918, the 1917 Act and the Boynton Act together established the statutory workers' compensation scheme. These statutes marked the first time an act of the Legislature occupied any of the "zone of twilight" where two concurrent powers may operate, as Justice Jackson put it in his concurrence in *Youngstown Sheet & Tube*, *supra*, 343 U.S. at page 637. Had the voters adopted a workers' compensation statute of their own as a replacement for the Roseville Act, or made some amendment to the 1917 Act or the Boynton Act by initiative statute prior to November 1918—before the then existing statutory scheme was given constitutional sanction— they would have had a free hand to legislate within the limits prescribed by article XIV, section 4, since *their* will would have been memorialized in the constitutional language. But that is not what happened. Instead, a century later we are faced with an effort to undermine the constitutionally sanctioned intent of the Legislature.

35

In *Western Indemnity I*, the Supreme Court held that the original 1911 version of former article XX, section 21 was enough to provide a constitutional foundation for the Boynton Act. But two Justices disagreed, as I have noted above. We may fairly and reasonably infer that, when asked to do so by the Legislature in 1918, voters responded by placing a detailed description of the Boynton Act, as improved and refined in the 1917 Act, into the Constitution itself, thereby adopting as their own the Legislature's pre-1918 interpretation of what it means to have a "complete system of workers' compensation." (*Mathews, supra,* 6 Cal.3d at p. 733 ["The proposed amendment duplicated in large measure section 1 of the 1917 act"].) As the *Mathews* court explained, article XIV, section 4, was " 'a necessary amplification and definition of the constitutional authority vested in the legislature by the amendment to the Constitution adopted October 10, 1911, to enable the enactment of a complete plan of workmen's compensation, which amendment failed to express sanction for the requisite scope of the enactment to make a complete and workable plan.' " (*Mathews, supra,* 6 Cal.3d at p. 733, fn. 11.)

This 1918 grant of augmented power—the police power plus, if you will—could not have been reserved by the people in 1911 because it did not exist yet. It placed the Legislature at the apex of a complex new administrative system that cut across all three branches of government, requiring regulation of workplace safety and workplace accident insurance, adjudication of claims, and ongoing assessment of the adequacy of medical treatment

36

and compensation.  The broad array of responsibilities detailed in article XIV, section 4, required the exercise of quasi-legislative powers that only the Legislature could undertake.[19]  Ballot statute electors were—and still today are—constitutionally unable to fill the role.  (*American Federation of Labor v. Eu*, *supra*, 36 Cal.3d at p. 708 [article II, section 8(a), legislative "powers are limited . . . to the adoption or rejection of 'statutes."].)

We may glean from this historical context that voters supporting the 1918 amplification of former article XX, section 21, intended that it be given priority over other provisions in the Constitution in the event of conflict.  In addition to the singular role given to the Legislature, as facilitated by the binding effect clause and the language "unlimited by any provision of this Constitution"—two key features of the operative language that were added in 1918—there is another reason to draw this inference.  These voters must be deemed to have been aware of the Supreme Court's holding in *Western Indemnity I* that former article XX, section 21, as originally adopted, "worked a repeal, *pro tanto*, of any conflicting provision which may have been in force theretofore."  (*Western Indemnity I*, *supra*, 170 Cal. at p. 695.)  It makes no sense that voters would have intended the 1918 version of former article XX, section 21, to have any

---

[19] *Wilson v. Hidden Valley Mun. Water Dist.* (1967) 256 Cal.App.2d 271, 279 ("The Legislature and administrators exercising quasi-legislative powers commonly resort to the hearing procedure to uncover, at least in part, the facts necessary to arrive at a sound and fair legislative decision.").

37

lesser priority than the original version upheld in *Western Indemnity I*.

Not surprisingly, courts have faithfully recognized the position of relative superiority within the Constitution that the plain language of article XIV, section 4 requires. In an opinion that supplies the most recent evidence of article XIV, section 4's continuing vitality today, a First District, Division One panel held only a few years ago that article XIV, section 4, "supersedes the state Constitution's due process clause with respect to legislation passed under the Legislature's plenary powers over the workers' compensation system." (*Stevens v. Workers' Comp. Appeals Bd.* (2015) 241 Cal.App.4th 1074, 1093 (*Stevens*).) *Stevens* also held that article XIV, section 4, "trumps the separation of powers clause [art. III, § 3] under the state Constitution's plain terms," since article III, section 3, expressly contemplates exceptions stated within the Constitution itself. (*Stevens*, at p. 1092.) Notably, to support these holdings, the *Stevens* court cited implied *pro tanto* repeal cases that trace back to *Western Indemnity I*. (*Stevens*, at p. 1093.)[20]

*McPherson* provides a useful point of contrast. Article XII, section 5, the plenary power clause at issue there—which

---

[20] *Hustedt*, *supra*, 30 Cal.3d at page 343 ("It is well established that the adoption of [Section 4] 'effected a repeal *pro tanto*' of any state constitutional provisions which conflicted with that amendment"); *Greener v. Workers' Comp. Appeals Bd.* (1993) 6 Cal.4th 1028, 1037, (article VI of the state Constitution governing courts' jurisdiction inapplicable to extent Legislature has exercised its powers under Section 4).

includes no language equivalent to the binding effect clause or the "unlimited by any provision of this Constitution" language in article XIV, section 4—was another ballot constitutional amendment passed in the October 1911 special election. (*McPherson, supra,* 38 Cal.4th at p. 1042.) The *McPherson* court observed there was no reason to believe that, in October 1911, voters would have intended to limit their own power under a simultaneously adopted amendment giving them broad new authority to adopt initiative statutes. (*Ibid.*) By contrast, there *is* reason to believe that, in the event of a conflict between article II, section 8(a), and the later adopted article XIV, section 4, in 1918, the latter would prevail. That reason is this— between 1911 and 1918, the *pro tanto* repeal holding in *Western Indemnity I* was handed down and, as noted above, knowledge of it is chargeable to voters.[21]

---

[21] The parties argue the issue of implied *pro tanto* repeal at length. In my view, the plain language of article XIV, section 4, is abundantly clear on this issue, and there is no need to resort to extrinsic interpretative aids. But even if the text were ambiguous, the position taken by the Proposition 22 proponents to the contrary—embraced by my colleagues in their construction of article XIV, section 4—rests on "clear statement" cases decided long after 1918. (E.g., *California Cannabis Coalition v. City of Upland* (2017) 3 Cal.5th 924; *Kennedy Wholesale, Inc. v. State Bd. of Equalization* (1991) 53 Cal.3d 245, 252.) Respondents correctly point out that these cases concern the issue whether procedural limitations not stated in article II, section 8(a), may be imported into it, which is not the issue here. But the more basic problem with the line of argument the Proposition 22 proponents pursue on the issue of *pro tanto* repeal is that we must seek to discern contemporaneous voter intent in 1918, not

3. *Structural context:  The binding effect clause in article XIV, section 4, is unique*

Finally, we must consider the language of article XIV, section 4, within the context of the Constitution as a whole. Upon an overall examination of our state charter, article XIV, section 4, stands in sharp contrast to all other, similar provisions in the document.  The Constitution gives the Legislature plenary power to do things in five places,[22] none of them providing ongoing enforcement authority, and nowhere else have the people said in the charter document that other actors in state government are bound by a "social public policy" enacted by the Legislature under a specifically delegated implementation power. These features in the operative text are unique.

The language "binding upon all departments of the State government" is particularly notable.  The plain meaning of "all departments of State government" encompasses not only the judicial, legislative, and executive branches of government (*Brydonjack v. State Bar* (1929) 208 Cal. 439, 442), but county and local government as well (*City of Sacramento v. Industrial Acc. Com.* (1925) 74 Cal.App. 386 (*City of Sacramento*)).  As noted above, unless we treat voter legislators as somehow exogenous to

---

voter intent based on tools and standards of interpretation that were unknown at the time.  In November 1918, *Western Indemnity I* established the state of the law on the issue.

[22] In addition to article XIV, section 4, see article XII, section 5 (Public Utilities); article XVI, sections 11 and 17 (Public Finance); article XIII, section 8.5 (Taxation); article XI, section 5 (Local Government).

our plan of government, they are encompassed within the phrase "all departments of the State Government" when they adopt ballot statutes. This leaves voter electors ample room to make discretionary policy choices by ballot statute in the field of workers' compensation. While voter electors cannot stand in the shoes of the Legislature under article XIV, section 4, they can always serve as "shadow" lawmakers, exercising the police power to enact any workers' compensation legislation they wish—so long as they respect prior "appropriate legislation" enacted by the Legislature in this special arena.

Several of the amici supporting the Proposition 22 proponents urge us to harmonize article XIV, section 4, and article II, section 8(a), powers by construing these two sources of legislative power in a manner that recognizes the Legislature and voter electors may share authority to act on the topic of workers' compensation. While I agree with that perspective in principle, Proposition 22 resists harmonization—unless we declare a naked preference for article II, section 8(a), which is ultimately what these amici invite us to do, invoking platitudinous statements about the importance of direct democracy, and ignoring the usurpation of the Legislature's delegated article XIV, section 4 power that this mode of "harmonization" implies. To resolve the conflict before us correctly, we must recognize that this case is one of a kind. By making its independent contractor definition unamendable, Proposition 22 effectively appoints voter electors the sole and exclusive expositors of what the constitutional term "employment" means, thereby displacing the Legislature entirely

41

on that topic.  This feature of Proposition 22 simply cannot be reconciled with article XIV, section 4.

All bets are off when it comes to ballot constitutional amendments, since voter electors exercise sovereign power in that context and may always substitute their judgment by adopting paramount law.  Indeed, in the final analysis, that is what this case is about.  Until and unless voter electors escalate things to the level of a proposed constitutional amendment, the Constitution expressly gives our elected Legislature a unique role—I believe the preeminent role—when statutes are enacted pursuant to article XIV, section 4.[23]  If, as of 1918, the California judiciary was bound by the Legislature's pre-1918 interpretation of what constitutes a "complete system of workers' compensation"—in the sense courts were expected to give deference to the Legislature's original judgment about the "basic features" of that system, just as the Supreme Court did in

_____

[23] A commonly used metaphor in cases involving challenges to initiative measures is that the initiative power in article II, section 8(a) is "in essence a legislative battering ram which may be used to tear through the exasperating tangle of the traditional legislative procedure and strike directly toward the desired end." (*Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization*, *supra*, 22 Cal.3d at p. 228.)  In statutory initiative cases, however, we must take care to consider whether, in some circumstances—depending on the constitutional provisions we are dealing with—"the exasperating tangle of the traditional legislative procedure" (*ibid.*) is better described as a deliberative process for resolving competing interests by compromise and accommodation that the people have affirmatively expressed a preference for using.

*Western Indemnity I*—then it seems to me voter electors passing initiative statutes were similarly bound, and are still bound today.

Disagreeing with me on this point, the majority opinion points out that the binding effect clause "appears to have been intended only to mean that the workers' compensation system applies to the state and local governments as employers." (Maj. opn., *ante*, at p. 27.) For this idea, the majority cites dicta from *Bautista v. State of California*, *supra*, 201 Cal.App.4th 716, and *City of Sacramento*, *supra*, 74 Cal.App. 386. Neither of these cases holds, nor has any case ever held, that local governments are the only "departments of the State government" covered by the binding effect clause in article XIV, section 4. Nor do these cases give any reason for why the binding effect clause should be read as an implicit partial definition of "employer," a term that appeared nowhere in the constitutional language and was already fully defined in the statutory scheme the voters ratified in 1918. (1917 Act, Stats. 1917, ch. 586 § 7.)[24]

Of the two cases, only *City of Sacramento*—decided less than a decade after article XIV, section 4 was adopted—merits

---

[24] A notable difference between the language of former article XX, section 21, as originally adopted in 1911, and the language of former article XX, section 21, as amended in 1918, was that the 1911 version used the terms "employer" and "employee" (former art. XX, § 21, added by Prop. 10, Special Elec. (Oct. 10, 1911)), while the 1918 amended version omitted them (former art. XX, § 21, amended by Prop. 23, Gen. Elec. (Nov. 5, 1918)), since by 1918 there were detailed definitions of those terms in the 1917 Act.

full discussion.  That case is illuminating, though not for the reason my colleagues cite it.  There, a city employer tried to invalidate death benefits awarded to the widow of one of its employees who was killed in the course of his employment. (*City of Sacramento*, *supra*, 74 Cal.App. at p. 387.)  The city employer tried to argue the widow's claim was "a matter purely within the jurisdiction and control of the city of which such persons may be officers or employees" (*id*. at p. 388), which today we would call the "home rule" doctrine, our state equivalent of federalism in the national government.

The contention was that the "compensation" of municipal employees falls within the exclusive domain of local government under former article XI, section 8½ of the Constitution.  (*City of Sacramento*, *supra*, 74 Cal.App. at pp. 387–388.)  This was not an argument directed to whether the statutory reach of workers' compensation extends to municipalities as "employers" within the meaning of the 1917 Act, the operative statute at the time. Under the plain language of the 1917 Act, "[t]he term 'employer' . . . shall be construed to mean . . . [t]he state, and each county, city and county, city, school district and all public corporations therein."  (1917 Act, Stats. 1917, ch. 586, § 7.)  The statutory definition of "employer" was never mentioned, which confirms that there was no genuine issue at the time about whether cities were included in that term.  Rather, the city employer advanced a jurisdictional argument that the Legislature had no constitutional power to address the "compensation" of local employees.

44

The Court of Appeal rejected the city employer's attempt to circumvent the 1917 Act by constitutional interpretation, holding that the word "compensation" in former article XX, section 21, as amended in 1918 (and now included in article XIV, section 4) was not used "in the sense of meaning wages" (*City of Sacramento*, *supra*, 74 Cal.App. at p. 392), but rather "in the sense of making amends for losses sustained, or the paying of an indemnity or an equivalent, so far as it is possible to do so in money value, to those dependents who have suffered such losses" (*id.* at p. 395). Because the Legislature was given plenary power to enforce liability for workers' compensation awards against "all persons," the court held, the term "persons" included municipalities. (*Ibid.*) Unpersuaded by the municipal employer's attempt to offer a reading of former article XX, section 21, that implicitly exempted it from the "complete system of workers' compensation" the Legislature created, the court pointed out that a municipality is a "department[] of the state government" bound by the " 'social public policy' " codified in former article XX, section 21. (*City of Sacramento*, at p. 395.)

In my view, the lesson to be drawn from *City of Sacramento* is this. What came before the court there—just as it does in this case—was an attempt to place an entire class of workers outside the workers' compensation system based on a narrow construction of the Legislature's constitutionally delegated power to create a "complete system of workers' compensation" and enforce compensation awards against covered employers. The *City of Sacramento* court was alert to the evasion and relied in

part on the "social public policy" embodied in former article XX, section 21 to reject it.  I regret that we have not been similarly alert to the constitutional evasion Proposition 22 represents.  As "shadow" legislators, the Proposition 22 voter electors are similarly bound by the "social public policy" codified in article XIV, section 4, particularly after the Legislature expressed its view of how that "policy" applies in passing Assembly Bill 5.

## III. Proposition 22 Violates Article III, Section 3

### A. *A Dispute Resolution System Within the Judicial Branch Is a "Basic Feature" of the Pre-1918 "Complete System of Workers' Compensation"*

Among the "basic features" of the pre-1918 workers' compensation system set up by the Legislature were these three: (1) the definition of "employee" included "[e]very person in the service of an employer . . . under any appointment or contract of hire or apprenticeship, express or implied, oral or written,"[25] (2) a " 'contract of hire' mean[t] a contract for personal services, as is indicated by the fact that the basis of compensation provided by the act is the amount of wages earned,"[26] and (3) disputes over the employment status of wage-earning workers—including on the issue of whether they were employees or independent contractors—were to be decided by the Industrial Accident

---

[25] 1917 Act, Statutes 1917, chapter 586, section 8(a); *Western Indemnity Co. v. Pillsbury* (1916) 172 Cal. 807, 810 (*Western Indemnity II*); *Press Pub. Co. v. Industrial Acc. Com.* (1922) 190 Cal. 114, 119.

[26] *Press Pub. Co. v. Industrial Acc. Com.*, *supra*, 190 Cal. at page 119; *Western Indemnity II*, *supra*, 172 Cal. at page 810.

Commission (IAC), subject to judicial review in the Court of Appeal.[27]

This last element—administrative resolution of workers' compensation claims, with review channeled directly into the Court of Appeal—was added in 1913, when the statutory workers' compensation scheme evolved from a purely voluntary system in the Roseville Act into a compulsory system in the Boynton Act. Designed to ensure expeditious resolution of claims by a decision maker imbued with judicial power, this feature of the Boynton Act has long been recognized by our Supreme Court as a "basic feature" of the pre-1918 workers' compensation system. (*Hustedt*, *supra*, 30 Cal.3d at p. 343.)

Article XIV, section 4, includes definitional language describing this dispute resolution process in detail. The first paragraph of article XIV, section 4, begins: The Legislature is empowered to make "full provision for vesting power, authority and jurisdiction in an administrative body with all the requisite *governmental functions* to determine any dispute or matter arising under such legislation, to the end that the administration of such legislation shall accomplish substantial justice in all cases expeditiously, inexpensively, and without incumbrance of any character." (Art. XIV, § 4, italics added.) The second paragraph

---

[27] 1917 Act, Statutes 1917, chapter 586, sections 17–19, 65–67; *PG&E*, *supra*, 180 Cal. at page 499; see *Murray v. Industrial Acc. Com.* (1932) 216 Cal. 340, 344 (employer has burden of proof on whether worker is independent contractor); *Drillon v. Industrial Acc. Com.* (1941) 17 Cal.2d 346, 350 (same) (*Drillon*).

of article XIV, section 4, fleshes this out in more detail, and specifically provides that any administrative decisions "*shall be subject to review by the appellate courts of this State.*" (*Ibid.*, italics added.)

In the pre-1918 statutory scheme, resolution of workers' compensation disputes was given to the IAC, and in some instances to appointed "referees" whose decisions it reviewed (Boynton Act, Stats. 1913, ch. 176, § 76),[28] but the above-quoted constitutional language confirms that this statutorily defined mode of dispute resolution was understood, ultimately, to be lodged in the judicial branch of government. The Supreme Court so held in 1916. Upholding the constitutionality of the Boynton Act in *Western Metal Supply Co. v. Pillsbury* (1916) 172 Cal. 407, the court rejected a claim that the use of an administrative agency for resolution of workers' compensation claims "transcends constitutional limitations in attempting to vest in the [IAC] the power—asserted to be judicial in its nature—to assess compensation and award it to such dependents." (*Id.* at p. 410.)

---

[28] Many years later, the Legislature enacted provisions permitting arbitration of workers' compensation disputes in some instances. (Lab. Code, § 3201.5.) That arbitral scheme, however, remains within the same administrative system for workers' compensation that has existed since enactment of the Boynton Act, with judicial review available in the Courts of Appeal, and has been held to be consistent with article XIV, section 4. (*Costa v. Workers' Comp. Appeals Bd.* (1998) 65 Cal.App.4th 1177, 1184–1186.) Our system of judicial arbitration (Code Civ. Proc., § 1141.10 et seq; see *Rivera v. Shivers* (2020) 54 Cal.App.5th 82, 90), another arbitral scheme established by statute within the judicial branch of government, provides a rough analogy.

"[I]n exercising [its] . . . powers," the *Western Metal Supply* court held, the IAC "is performing precisely the same functions that are performed by any court in passing upon questions brought before it." (*Id*. at p. 412; see *Yosemite Lumber*, *supra*, 187 Cal. at p. 779 ["The power to determine whether or not the liability referred to in the first paragraph of the above section and imposed by this law exists against any person is judicial power."].)

## B. *Proposition 22 Defeats or Impairs a "Core" or "Essential" Governmental Function*

It is not the change in the substantive law governing the issue of employee versus independent contractor status that concerns me here—I have addressed that issue above in discussing the conflict between concurrent article II, section 8(a), and article XIV, section 4, powers (see parts II.C.–II.D. above)— but, rather, I am focused on the dismantling of the constitutionally ratified workers' compensation dispute resolution scheme that free-agent workers analogous to app-based drivers today were entitled to invoke in 1918. This aspect of Proposition 22 raises an independently fatal constitutional deficiency.

Because the pre-1918 workers' compensation system established by the Legislature called for the resolution of claims by an administrative agency exercising judicial power, Proposition 22 took away an adjudicative function that was constitutionally committed to the judicial branch in article XIV, section 4. It therefore violates article III, section 3, which states that, within our "triune" scheme of government (*Lorraine v.*

49

*McComb* (1934) 220 Cal. 753, 756), "[p]ersons charged with the exercise of one power may not exercise either of the others except as permitted by this Constitution" (art. III, § 3).  Electors exercising the police power to adopt statutes as "shadow" legislators, as I have noted above, must qualify as "[p]ersons charged with the exercise of one power" within the meaning of article III, section 3.  (*Ibid.*)

If the Proposition 22 proponents are correct that the holding in *McPherson* should be extended and applied in this case, they run headlong into a separation of powers problem under article III, section 3.  That is because, even assuming voter electors may exercise a "similar power" (*McPherson, supra,* 38 Cal.4th at p. 1033) to that of the Legislature in a manner that permits them to legislate freely in the field of workers' compensation, without limitation—indeed, in derogation of the Legislature's article XIV, section 4, power—there remains a critical difference.  Voter electors exercising the police power to pass ballot statutes are subject to separation of powers constraints, while the Legislature in the exercise of its power under article XIV, section 4, is not.  (*Stevens, supra,* 241 Cal.App.4th at p. 1092.)  Thus, in addition to the separation of powers violation identified by the majority opinion, another article III, section 3, problem comes to the forefront if the Proposition 22 proponents' reading of *McPherson* is correct:  By destroying a mode of dispute resolution that app-based drivers are entitled to utilize within the judicial branch of government, Proposition 22 unconstitutionally usurps judicial power.

50

To uphold this initiative would "defeat or materially impair" the exercise of a judicial function (*Hustedt*, *supra*, 30 Cal.3d at p. 338) as well as its doctrinal cousin, the rule against impairment of "core" (*Carmel Valley Fire Protection Dist. v. State of California* (2001) 25 Cal.4th 287, 297) or "essential" (*Butt v. State of California* (1992) 4 Cal.4th 668, 700, fn. 26) governmental functions. As the Supreme Court explained many years ago in *Brydonjack v. State Bar*, *supra*, 208 Cal. at page 442: "The sum total of this matter is that the Legislature may put reasonable restrictions upon constitutional functions of the courts provided they do not defeat or materially impair the exercise of those functions." Fair questions are often raised in cases involving this kind of constitutional issue as to whether the challenged infringement is of a power that may truly be considered "core" or "essential," but in this case it seems to me those questions are answered by the simple fact that, as courts have long construed it, we are dealing with a power that is delineated in the constitutional text.

The issue of whether a given worker under a contract for hire has the status of an employee or an independent contractor is a judicial question. The Supreme Court so held in *Drillon*, *supra*, 17 Cal.2d 346. At issue in *Drillon* was the employment status of one Claude Hooper, a thoroughbred racing jockey who, while free to work for any horse owner, raced a particular horse subject to guidance and instruction from the horse's owner. (*Id.* at pp. 348–350.) The IAC concluded that Mr. Hooper was an

51

employee of the owner (*id.* at pp. 348–349), and the Supreme Court affirmed (*id.* at pp. 355–356).

Faced with an argument from the employer that Mr. Hooper's status was controlled by the rules of the horse-racing board promulgated pursuant to statute (*Drillon, supra,* 17 Cal.2d at pp. 352–354), the court held that "the issue of whether or not a person is an employee or an independent contractor is a judicial question and not a legislative or executive one. Legislative and administrative regulations relating to the affairs of persons furnishing services to the persons to whom furnished cannot control the judicial branch of the government in its determination of that question." (*Id.* at p. 355.) The same analysis applies here.

The Attorney General argues that independent contractors were always "excluded" from workers' compensation coverage, and that in Proposition 22 the voters simply changed the substantive law determining whether app-based drivers have that status. There was no such "exclusion"; one was not needed. Because independent contractor status is, and always was, the opposite of employee status, and because article XIV, section 4, today, as under its previous incarnation in former article XX, section 21, covers only workers in an "employment" relationship, independent contractors have always been outside the reach of our statutory workers' compensation system. (*PG&E, supra,* 180 Cal. at p. 500; *Carstens v. Pillsbury* (1916) 172 Cal. 572, 580.) That is nothing new, and it is not a matter of statutory "exclusion."

52

The question here is not whether independent contractors per se are outside the system. It is whether app-based drivers, a category of wage workers that did not exist prior to 1918, may be expelled from the present-day workers' compensation system by labelling them independent contractors, thereby depriving them of any ability to have their employment status determined within the system. Wage workers in the position of today's app-based drivers (who kept driving during the pandemic at great personal risk to themselves and their families) have always been presumptively within the workers' compensation system, which is why respondents cite *Drillon*. Neither the Attorney General nor the interveners discusses *Drillon* or offers any meaningful response to the point respondents make on the strength of it.

The critical point *Drillon* illustrates is that, prior to 1918, independent contractor status was nothing more than an employer's defense, subject to proof on a case-by-case basis in workers' compensation proceedings before an administrative tribunal that exercised judicial power, subject to review in the Courts of Appeal. The 1917 Act defined the term "independent contractor" in the same way the Supreme Court applied the concept twenty-five years later in *Drillon*. That statute provided, "The term 'independent contractor' shall be taken to mean, for purposes of this act: Any person who renders service, other than manual labor, for a specified recompense for a specified result, under the control of his principal as to the result of his work only and not as to the means by which such result is accomplished."

(1917 Act, Stats. 1917, ch. 586, § 8(b).) And the people gave constitutional sanction to this definition in 1918.

In passing Assembly Bill 5, the Legislature codified the ABC test recognized in *Dynamex, supra*, 4 Cal.5th 903, as the general rule to test for employee versus independent contractor status under the "suffer or permit to work standard" (*id.* at pp. 965–967), "subject to a series of statutory exemptions" for various industries (*People v. Uber Technologies, Inc.* (2020) 56 Cal.App.5th 266, 277, fn. 5). Under Assembly Bill 5, all putative employers must continue to litigate any issue of employee versus independent contractor status before the Workers' Compensation Appeals Board, and ultimately in the Courts of Appeal if necessary. Assembly Bill 5 simply confirmed that, as a general matter, the ABC test for independent contractor status governs, except that the more complex, multi-factor *Borello* test governs in certain industries. Both tests are consistent with the 1917 Act's "independent contractor" definition and the "suffer or permit" standard courts use to apply that definition.[29]

---

[29] *Dynamex, supra*, 4 Cal.5th at pages 961–962 ("[T]he suffer or permit to work standard, by expansively defining who is an employer, is intended to preclude a business from evading the prohibitions or responsibilities embodied in the relevant wage orders directly or indirectly—through indifference, negligence, intentional subterfuge, or misclassification. It is well established, under all of the varied standards that have been utilized for distinguishing employees and independent contractors, that a business cannot unilaterally determine a worker's status simply by assigning the worker the label

Thus, in Assembly Bill 5 the Legislature did not remove any of the "exempted" industries from the workers' compensation system entirely, which is the much more radical step that Proposition 22 takes. In the one situation prior to Proposition 22 where the Legislature created an industry-specific definition of the term "independent contractor" (see Bus. & Prof. Code, § 10032, subd. (b) [certain real estate licensees]), there is an exception for workers' compensation (*ibid.* ["For purposes of workers' compensation the characterization of the relationship shall be governed by section 3200, and following, of the Labor Code"]).

That makes Proposition 22 the first attempt in the history of California workers' compensation to drop a class of wage workers in one industry entirely from the workers' compensation system. A telltale sign of the constitutional questions raised by this bold and unprecedented move is that, under the new statutory definition of "independent contractor," the eligibility of app-share drivers for workers' compensation benefits is determined strictly by the employer's unilateral designation in a form contract—contrary to the "suffer or permit" standard—

'independent contractor' or by requiring the worker, as a condition of hiring, to enter into a contract that designates the worker an independent contractor."); *id.* at p. 944 ("[A]t the time the suffer or permit language was initially adopted as part of a wage order in 1916, such language 'was already in use throughout the country in statutes regulating and prohibiting child labor (and occasionally that of women), having been recommended for that purpose in several model child labor laws published between 1904 and 1912.' ").

which effectively bars these drivers from seeking to have their "employment" status adjudicated by a decision maker within the judicial branch. The route is indirect, but the result is a violation of article III, section 3.

## IV. The Argument That, in Proposition 22, Voter Electors Made a Garden-variety Policy Choice, Is Incorrect

Pointing to the language in article XIV, section 4, empowering the Legislature to establish a "complete system of workers' compensation" for "any or all . . . workers," the Proposition 22 proponents contend that it was perfectly permissible to withdraw a segment of workers from the original statutory system by initiative statute, and to provide workplace accident benefits for that segment of workers in a new and different way.[30] There is nothing of significance to see here, we

---

[30] The actual constitutional language quoted by the Proposition 22 proponents on this textual point is that the Legislature shall have the power to create and enforce a system of workers' compensation "liability *on the part of any or all persons*"—in context, clearly meaning employers—"to compensate *any or all of their workers*"—in context, clearly meaning employees of said employers (hence the phrase "their workers")—"for injury or disability, and their dependents for death incurred or sustained by the said workers in the course of their employment, irrespective of the fault of any party." (Art. XIV, § 4, italics added.) It is a stretch to construe the phrase "any or all . . . workers" to refer broadly to statewide coverage, rather than, as the context more naturally suggests, to the coverage status of workers who may have been hired by a given employer, an issue that seems amenable to determination only on an employer-by-employer basis. But because the Proposition 22 proponents' "any or all . . . workers" argument is flawed for other,

are told, because the voter electors simply exercised a policy choice concerning whom to cover in the statutory workers' compensation system differently than the Legislature did.

But this was no ordinary policy choice. Proposition 22 overturned a constitutionally ratified "social public policy" choice the Legislature originally made in the Boynton Act and the 1917 Act, and then reaffirmed in Assembly Bill 5 in the course of discharging its ongoing duty to implement the "complete system of workers' compensation" prescribed by article XIV, section 4. It does not matter whether voter electors now have their own view, different from the Legislature's view, of the appropriate statutory reach of that system. What is dispositive in the face of conflict on this issue is that, as conditions changed over time, the Legislature was specifically tasked with making the call based on its view of what the Constitution required, and its call must be respected.

The "any or all . . . workers" language in article XIV, section 4, simply confirms that, by 1918, the Legislature had not covered all potentially eligible wage workers. The coverage of the statutory scheme improved considerably between 1911 and 1918, but it was not fully comprehensive. While the objective of moving from a voluntary system to a compulsory system was to extend the reach of the statutory scheme, the 1917 Act still fell short of universal coverage. The 1917 Act did not cover "casual" workers;

more fundamental reasons, as explained below, I am willing to indulge arguendo the broader construction of these words that they put forth.

it did not cover "domestic" workers; and it did not cover
"agricultural" workers.[31] "Casual" workers were not considered
wage workers under contracts for hire. They were either
volunteers or nominally paid temporary workers, and their status
as non-employees continues to be reflected in the Labor Code to
this day.[32]

Why the Legislature created express carveouts for
"domestic" workers and "agricultural" workers is another story—
and not a happy one, since these two groups consisted largely of
workers of color—but what matters here is that the language
"any or all . . . workers" was broad enough to do two things. It
not only described the less-than-comprehensive coverage the

---

[31] 1917 Act, Statutes 1917, chapter 586, section 8(a).

[32] See Labor Code, section 3352, subdivisions (a)(4), (a)(5),
(a)(7), (a)(9), (a)(10) and (a)(11); *Gund v. County of Trinity* (2020)
10 Cal.5th 503, 510 ("volunteers are typically not eligible" for
workers' compensation benefits). The Proposition 22 proponents
cite *Graczyk v. Workers' Comp. Appeals Bd.*, *supra*,
184 Cal.App.3d 997, for the proposition that, because the
workers' compensation system is statutory, a ballot statute may
be used to "withdraw" previously covered workers from the
system. They misread *Graczyk*. At issue there was a statutory
provision (former Lab. Code, § 3352, subd. (k)) added in 1981 to
*clarify* that unpaid student athletes were not employees eligible
for workers' compensation. (*Graczyk*, at pp. 1001–1005.) Non-
wage workers were not covered in 1917, and in 1981 the
Legislature simply confirmed that this class of workers remained
outside the system. *Graczyk* would be on point if Proposition 22
simply clarified that casual carpool commuter drivers (the ones
that disappeared in the COVID-19 pandemic, while paid app-
based drivers kept working) are not covered by workers'
compensation.

Legislature had enacted by 1918, but at the same time confirmed the Legislature's authority—if it wished to exercise it—to allow further expansion in the future.  The Legislature exercised that authority in 1959 for "agricultural" workers[33] and again in 1975 for "domestic" workers.[34]  Voter electors could have done the same thing by initiative statute.  The holding in *McPherson* confirms that.  The eventual inclusion of those disfavored groups was a mark of progress, but it did not throw open the original core of the "complete system of workers' compensation" for later statutory revision.  The holdings in *Mathews* and *Hustedt* confirm that.

The Proposition 22 proponents cite various cases holding that the workers' compensation system is statutory and that

---

[33] Statutes 1959, chapter 505, page 2466, section 1 (repealing statutory language carried over from the original exclusion in the 1917 Act of "any employee engaged in . . . in farm, dairy, agricultural, viticultural or horticultural labor, [or] in stock or poultry" work, then codified at former Labor Code section 3352 (Stats. 1937, ch. 90, § 3352(c), p. 267)); see *S. G. Borello & Sons, Inc. v. Dept. of Industrial Relations* (1989) 48 Cal.3d 341 (after removal of the exclusion, addressing circumstances in which agricultural workers may be considered employees).

[34] Statutes 1975, chapter 1263, page 3315, section  5.5 (repealing statutory language carried over from the original exclusion in the 1917 Act of "any employee engaged in household domestic service," then codified at former Labor Code section 3352 (Stats. 1937, ch. 90, § 3352(b), p. 267)); see *In-Home Supportive Services v. Workers' Comp. Appeals Bd.* (1984) 152 Cal.App.3d 720, 735 (after removal of the exclusion, addressing circumstances in which domestic workers may be considered employees).

courts have consistently rejected constitutional challenges when the Legislature has made changes to the system.  (See, e.g., *Stevens*, *supra*, 241 Cal.App.4th at pp. 1094–1096 [statute eliminating workers' compensation board's authority to determine medical necessity of treatment and vesting such authority in an independent medical review organization]; *Wal-Mart Stores, Inc. v. Workers' Comp. Appeals Bd.* (2003) 112 Cal.App.4th 1435 [statute limiting workers' compensation liability for benefits payable to treat psychiatric injury to workers employed for more than six months, unless the injury was caused by a sudden and extraordinary employment condition, held to be consistent with article XIV, section 4].)

These cases resolve nothing here.  Courts have long recognized that the Legislature must be given wide berth to adjust and refine the workers' compensation system to meet the needs of the day, a notion that is fully consistent with my reading of article XIV, section 4.  (See *Stevens*, *supra*, 241 Cal.App.4th at p. 1096 ["it is not our place under the state Constitution to 'second-guess the wisdom of the Legislature' in making these determinations"]; *Facundo-Guerrero v. Workers' Comp. Appeals Bd.* (2008) 163 Cal.App.4th 640, 651 [same].)  No one disputes that statutory changes may be made to the workers' compensation system at any time if the Legislature determines changes are necessary to ensure its effectiveness.  And by initiative statute, the voters may join in that ongoing project— since they, too, may legislate on the same topic—as long as they do so in a manner that is consistent with prior judgments of the

60

Legislature made by "appropriate legislation." What is key is that no case in this line either holds that "basic features" of the pre-1918 workers' compensation system may be eliminated by statute, or involves a direct conflict between an initiative statute and a statute passed by the Legislature.

It is ironic that the Proposition 22 proponents rely on the phrase "any or all . . . workers" in support of their argument that the scope of statutory workers' compensation may be freely expanded or contracted, accordion-like, without limit by statutory initiative. They now seek to justify for app-based drivers the same kind of second-class citizenship treatment that agricultural and domestic workers were given in the original policy debate over the reach of workers' compensation coverage. The interveners are quite explicit about this. They point to the pre-1918 exclusion of agricultural and domestic workers as proof that app-based drivers may be statutorily excluded today. About that, all I will say is that the United States Supreme Court may be willing to read the federal Constitution in a manner that doubles down on the mistreatment of fellow citizens who were not considered "full and equal" when the Fourteenth Amendment was adopted (*Dobbs v. Jackson Women's Health Org.* (2022) ___U.S.___ [142 S.Ct. 2228, 2329] (dis. opn. of Kagan, J.)), but in reading our state Constitution, I am not. These exclusions are a historical embarrassment, not a license to create *new* social hierarchies by statute.

Which brings me back to footnote 9 in *McPherson*. Moved to do so by the same progressive reform movement that brought

61

us the powers of direct democracy, the Legislature made a fundamental choice to cover as many wage workers under contracts for hire as it could between 1911 and 1917. Many decades later, in Assembly Bill 5, the 2019 Legislature expressed its view that the inclusion of app-based drivers within the workers' compensation system is required. As I see things, the Legislature's determination—which represents its interpretation of what the term "employment" means for purposes of the "complete system of workers' compensation" codified in article XIV, section 4—must prevail over that of the Proposition 22 voter electors. Voter electors retain ultimate power to override the Legislature, but in this context they must do so by constitutional amendment. (See *Legislature v. Deukmejian* (1983) 34 Cal.3d 658, 674 ["[I]t was at no time intended that . . . permissive legislation by direct vote should override the other safeguards of the constitution. If an amendment of the constitution were intended, the provision requires steps to be taken that will apprise the voters thereof so that they may intelligently judge of the fitness of such measure as a constituent part of the organic law."].)

## V.     Conclusion

"[I]f any portion, section, subdivision, paragraph, clause, sentence, phrase, word, or application of" Business and Professions Code section 7451—the "independent contractor" definition adopted in Proposition 22—"is for any reason held to be invalid by a decision of any court of competent jurisdiction, that decision shall apply to the entirety of the remaining provisions of

62

this chapter, and no provision of this chapter shall be deemed valid or given force of law." (Bus. & Prof. Code, § 7467, subd. (b).) I believe the "independent contractor" definition in Proposition 22 is constitutionally infirm and that, as a result, the entire initiative by its own terms must fall.

It is undoubtedly true that "[t]he amendment of the California Constitution in 1911 to provide for the initiative and referendum signifies one of the outstanding achievements of the progressive movement of the early 1900's." (*Associated Home Builders etc., Inc. v. City of Livermore* (1976) 18 Cal.3d 582, 591.) But article XIV, section 4, was another outstanding achievement of progressive era reform, and it must be treated with equal dignity.

In article XIV, section 4, the people gave constitutional sanction to an elaborate, pre-1918 statutory workers' compensation scheme. To implement the scheme, they conferred plenary power on the Legislature, and the Legislature alone. This expansive and singular delegation of authority, a species of power that may be found nowhere else in our charter document, is "unlimited by any provision of [the] . . . Constitution," and imposes on the Legislature an ongoing duty of enforcement. (Art. XIV, § 4.) The pre-1918 statutory scheme itself, together with "appropriate legislation" enacted from time to time pursuant to the Legislature's enforcement power, reflects a "social public policy" that is "binding upon all departments of the state government." (*Ibid.*)

The central dilemma posed by this case is that Proposition 22 flies in the face of the Legislature's declared "social public policy" in the field of workers' compensation, as most recently reflected in its enactment of Assembly Bill 5. An integral part of the workers' compensation system the Legislature has been implementing for more than a century pursuant to its article XIV, section 4, power is that, with two exceptions that were long ago eliminated, all wage workers are entitled to have their employment status determined by decision makers exercising judicial power.

By jettisoning app-based drivers from this constitutionally mandated system, the independent contractor definition in Proposition 22 not only violates the plain terms of article XIV, section 4—because the system that remains is not "complete," as the Legislature construed this constitutional requirement in the pre-1918 system—but conflicts directly with the Legislature's recent exercise of its article XIV, section 4, power in Assembly Bill 5. For both of these reasons, Proposition 22 must be invalidated as violative of article XIV, section 4. And because Proposition 22 destroys the ability of app-based drivers to have their employment status determined within the judicial branch of government, it must also be invalidated as violative of article III, section 3.

I would affirm in all respects.

STREETER, J.

64

Trial Court:   Superior Court of California, County of Alameda

Trial Judge:   Hon. Frank Roesch

Counsel:        Rob Bonta, Attorney General, Thomas S. Patterson, Senior Assistant Attorney General, Mark Beckington, Supervising Deputy Attorney General and Jose A. Zelidon-Zepeda, Deputy Attorney General, for Defendants and Appellants.

O'Melveny & Myers, Jeffery L. Fisher; Nielsen Merksamer Parrinello Gross & Leoni, Arthur G. Scotland, Sean P. Welch, Kurt R. Oneto and David J. Lazarus, for Interveners and Appellants.

DLA Piper, Stanley J. Panikowski and Justin R. Sarno for Former Attorney General of California Daniel E. Lungren as Amicus Curiae on behalf of Defendants and Appellants.

Eimer Stahl, Robert E. Dunn and Collin J. Vierra for Citizens in Charge as Amicus Curiae on behalf of Defendants and Appellants.

David A. Carrillo, California Constitution Center, University of California, Berkeley; Benbrook Law Group, Stephen M. Duvernay for California Constitution Center as Amicus Curiae on behalf of Defendants and Appellants.

Davis Wright Tremaine, Rochelle L. Wilcox and Alexa A. Graumlich for California Chamber of Commerce as Amicus Curiae on behalf of Defendants and Appellants and Interveners and Appellants.

Holtzman Vogel Baran Torchinsky Josefiak, Alex
Vogel, Edward M. Wenger and Andrew Pardue
for California Policy Center as Amicus Curiae
on behalf of the Defendants and Appellants and
Interveners and Appellants.

Willenken, Kenneth M. Trujillo-Jamison for
California Asian Pacific Chamber of Commerce,
California Hispanic Chambers of Commerce,
Los Angeles Metropolitan Churches, National
Action Network Los Angeles, National Action
Network Sacramento Chapter Inc., National
Asian American Coalition, and National
Diversity Coalition ("Communities-of-Color
Organizations") as Amici Curiae on behalf of
Defendants and Appellants and Interveners
and Appellants.

Baker Botts, Michael W. Ward for Arnold
Schwarzenegger as Amicus Curiae on behalf of
Defendants and Appellants and Interveners
and Appellants.

Howard Jarvis Taxpayers Foundation, Jonathan M.
Coupal, Timothy A. Bittle and Laura E.
Dougherty for Howard Jarvis Taxpayers
Association as Amicus Curiae on behalf of
Defendants and Appellants and Interveners
and Appellants.

Jenner & Block, Laurie J. Edelstein and Adam G.
Unikowsky for Chamber of Commerce of the
United States of America as Amicus Curiae on
behalf of Defendants and Appellants and
Interveners and Appellants.

*Castellanos v. State of California – A163655*

2

King & Spalding, Albert Giang, Jeffery Hammer
and Ramon A. Miyar for Marketplace Industry
Association, Inc. as Amicus Curiae on behalf of
Defendants and Appellants and Interveners
and Appellants.

Buchalter, Steven G. Churchwell and Berit Elam
for Daniel Schnur, T. Anthony Quinn and
Robert M. Stern as Amici Curiae on behalf of
Defendants and Appellants and Interveners
and Appellants.

weintraub tobin chediak coleman grodin,
Brendan J. Begley for Independent Drivers
Alliance of California, Kelly Rickert, Ali
Mazhin and Stephanie Whitfield as Amici
Curiae on behalf of Defendants and Appellants
and Interveners and Appellants.

Olson Remcho, Robin B. Johansen, Richard R. Rios,
Deborah B.  Caplan, Benjamin N. Gevercer;
Altshuler Berzon, Stephen P Berzon, Scott A.
Kronland, Stacey M. Leyton, Juhyung Harold
Lee for Plaintiffs and Respondents Hector
Castellanos, Joseph Delgado, Saori Okawa and
Michael Robinson.

Service Employees International Union, Nicole G.
Berner and Steven K. Ury for Plaintiff and
Respondent Service Employees International
Union.

Richard L. Hasen; Public Counsel, Mark D.
Rosenbaum and Kathryn Eidmann for
California Election Law Professors as Amicus
Curiae on behalf of Plaintiffs and Respondents.

*Castellanos v. State of California – A163655*

3

Hina B. Shah, Women's Employment Rights Clinic, Golden Gate University School of Law Benjamin Beach, PowerSwitch Action; Nayantara Mehta and Brian Chen, National Employment Law Project, for Gig Workers Rising, Mobile Workers Alliance, Rideshare Drivers United-California, We Drive Progress, A Better Balance, ACCE Institute, Action Center on Race & the Economy, Asian Americans Advancing Justice – Los Angeles, Bet Tzedek, California Employment Lawyers Association, California Immigrant Policy Center, Centro Legal de la Raza, Chinese Progressive Association, Economic Policy Institute, Jobs With Justice Education Fund and Jobs With Justice San Francisco, Lawyers Committee for Civil Rights of the San Francisco Bay Area, Legal Aid at Work, Los Angeles Black Worker Center, Maintenance Cooperation Trust Fund, National Black Worker Center, National Council for Occupational Safety and Health, National Domestic Workers Alliance, National Employment Law Project, Pilipino Workers Center, PowerSwitch Action, Public Rights Project, Santa Clara County Wage Theft Coalition, Women's Employment Rights Clinic of Golden Gate University School of Law and Worksafe, as Amici Curiae on behalf of Plaintiffs and Respondents.

Bush Gottlieb, Julie Gutman Dickinson, Hector De Haro, and Luke Taylor for International Brotherhood of Teamsters Local 848 and The Los Angeles County Federation of Labor, AFL-CIO, as Amici Curiae on behalf of Plaintiffs and Respondents.

*Castellanos v. State of California* – A163655

4

City of San Francisco, David Chiu, City Attorney, Sara J. Eisenberg, Chief of Complex and Affirmative Litigation, and Molly J. Alarcon Deputy City Attorney; City of Oakland, Barbara J. Parker, City Attorney, Maria Bee, Chief Assistant City Attorney, Zoe Savitsky, Supervising Deputy City Attorney and Katherine Read, Fellowship Attorney; City of Los Angeles, Michael N. Feuer, City Attorney, Kathleen Kenealy, Chief Assistant City Attorney, and Michael J. Bostrom, Senior Assistant City Attorney for the Cities of San Francisco, Oakland and Los Angeles as Amici Curiae on behalf of Plaintiffs and Respondents.

Eric M. Overholt and Andrew W. Lockard for California Applicants' Attorneys Association as Amicus Curiae on behalf of Plaintiffs and Respondents.

Catherine L. Fisk, University of California, Berkeley; Veena Dubal and Joseph Grodin, Emeritus Professor of Law, University of California, Hastings College of Law, for Labor Law Professors Sameer Ashar, Veena Dubal, Catherine Fisk, Charlotte Garden, Joseph Grodin, William B. Gould IV, Stephen Lee, Sanjukta Paul, Leticia Saucedo, Reuel Schiller, Katherine Stone and Noah D. Zatz as Amici Curiae on behalf of Plaintiffs and Respondents.

*Castellanos v. State of California* – A163655

5